Case Nos.:    **2:24-cv-02727-JMG**
**2:24-cv-06397-JMG**
**2:24-cv-06498-JMG**
**2:24-cv-06617-JMG**

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

### IN THE MATTER OF: STREAM TV NETWORKS, INC., et al.

### APPEALS OF REMBRANDT 3D HOLDING LTD.
### AND VISUAL SEMICONDUCTOR, INC. FROM ORDERS ENTERED IN
### BANKR. E.D. Pa. No. 23-10763-AMC

### <u>APPELLEE'S ANSWERING BRIEF</u>

Steven M. Coren, Esquire
**COREN & RESS, P.C.**
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 735-8700

Michael D. Vagnoni, Esquire
Edmond M. George, Esquire
**OBERMAYER REBMANN MAXWELL & HIPPEL LLP**
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
Telephone: (215) 665-3066

*Counsel to Appellee William A. Homony, Chapter 11 Trustee*

## APPELLEE'S CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Bankruptcy Procedure 8014(b), 8014(a)(1), and 8012,

Appellee states as follows: 1) Debtor Stream TV Networks, Inc. has no parent corporation and

no publicly held corporation owns 10% or more of its stock.  According to the records of Stream

TV Networks, Inc., Hawk Investment Holdings Limited is a privately held entity that holds more

than 10% of the stock of Stream TV Networks, Inc.; 2) Debtor Stream TV Networks, Inc. is the

parent corporation of Debtor Technovative Media, Inc.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. iii

COUNTERSTATEMENT OF ISSUES ON APPEAL ..................................................1

STANDARD OF APPELLATE REVIEW ....................................................................1

STATEMENT OF THE CASE.....................................................................................2

      A.     After Extensive "Acrimony" and "Relative Lack of Progress," The Bankruptcy Court Takes The Extraordinary Measure of Appointing a Chapter 11 Trustee.......3

      B.     Rajan, VSI, and Rembrandt's History of Collusive Actions ..................................3

            i.     The Prior Bankruptcy Cases ..........................................................4

            ii.    Rembrandt's Suspect Claims ........................................................5

            iii.   Transactions That Benefitted VSI and Rembrandt ......................6

            iv.   Rajan's History of Untrustworthiness...........................................7

      C.     The Trustee is Appointed and Conducts a Fulsome Investigation, Finding That VSI Continued the Unapproved Use of the Debtor's Assets ..................................7

      D.     VSI and Rembrandt's Prior "Offers" ......................................................8

      E.     The Hawk Settlement.........................................................9

      F.     The Sale Motion and Bid Procedures ..................................................12

      G.     The Sale Closes.......................................................17

SUMMARY OF THE ARGUMENT ...........................................................................18

ARGUMENT ............................................................................................................19

      A.     The Appeals Should Be Dismissed as Statutorily Moot Under Section 363(m) of the Bankruptcy Code ........................................................19

            i.     Standard for Statutory Mootness ..............................................19

            ii.    The Elements of Statutory Mootness Are Satisfied Here .........................21

1.     The Sale Order Was Not Stayed ....................................................21

2.     SeeCubic Was a Good Faith Purchaser Within the Meaning of Section 363(m)..................................................................................22

3.     Modification of the Sale Order Will Impact the Sale's Validity ...25

B.     VSI Lacks Standing to Pursue Its Appeals ............................................26

C.     Appellants' Arguments Are Not Supported By Record Citations .........................29

D.     The Trustee Was Authorized Under the Bankruptcy Code to Sell the Stream Debtor's Assets and the Equity in Technovative's Downstream Entities ............30

i.     The Sale Only Involved Estate Property....................................30

ii.    Even If Rembrandt IP Was Implicated In the Sale, the Assets Were Properly Sold Free and Clear Pursuant to Section 363(f)........................32

iii.   The Bankruptcy Court Was Not Required to Make Additional Determinations About Property of the Estate or Rembrandt's Interests Prior to Approving the Settlement or the Sale ...........................................34

E.     The Bankruptcy Court Properly Approved the Settlement....................................37

i.     The Settlement Satisfied the *Martin* Factors and Was Well Within the Range of Reasonableness.............................................................38

ii.    The Settlement and Sale Did Not Constitute an Improper *Sub Rosa* Plan of Reorganization...............................................................40

F.     The Bankruptcy Court Properly Approved the Bidding Procedures Because They Were Fair, Reasonable, and Appropriate Under the Circumstances to Maximize the Value of the Assets .......................................................................43

G.     The Bankruptcy Court Properly Approved the Sale Under Section 363(b) .........45

i.     The Sale Satisfies the Requirements of Section 363(b)............................45

ii.    No "Criminal Violations" Have Occurred .................................47

iii.   Rembrandt's Interests, If Any, Have Been Adequately Protected............49

CONCLUSION...................................................................................................................50

## TABLE OF AUTHORITIES

**Cases**

*Cinicola v. Scharffenberger*, 248 F.3d 110 (3d Cir. 2001) .................................................. 31

*DeForte v. Borough of Worthington*, 844 F. App'x 511 (3d Cir. 2021) ................................ 29

*In re 388 Route 22 Readington Holdings, LLC*, 2021 WL 4811409 (3d Cir. Oct. 15, 2021) .................... 24

*In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 (3d Cir. 1986) ..................................... 23

*In re ANC Rental Corp.*, 280 B.R. 808 (D. Del. 2002) ................................................. 27

*In re Atl. Gulf Cmtys. Corp.*, 326 B.R. 294 (Bankr. D. Del. 2005)................................ *passim*

*In re Atl. Gulf Communities Corp.*, 369 B.R. 156 (Bankr. D. Del. 2007)................................ 35

*In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547 (Bankr. S.D.N.Y. 1997) ............................ 45

*In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir.1983) ....................................... 41, 43

*In re Brown*, 851 F.3d 619 (6th Cir. 2017) ...................................................... 20, 22

*In re Capmark Fin. Grp. Inc.*, 438 B.R. 471 (Bankr. D. Del. 2010).................................... 41

*In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009) ............................................... 41

*In re Covenant Partners, L.P.*, 541 B.R. 804 (Bankr. E.D. Pa. 2015) .................................. 38

*In re Crown Vill. Farm, LLC*, 415 B.R. 86 (Bankr. D. Del. 2009) ..................................... 45

*In re Culp*, 545 B.R. 827 (D. Del. 2016)......................................................... 1, 46

*In re DeCurtis Holdings LLC*, 2023 WL 5153645 (Bankr. D. Del. Aug. 9, 2023)........................ 36

*In re Edwards*, 228 B.R. 552 (Bankr. E.D. Pa. 1998).................................................. 43

*In re Energy Future Holding Corp.*, 527 B.R. 157 (D. Del. 2015) ..................................... 41

*In re Energy Future Holding Corp.*, 596 B.R. 473 (D. Del. 2019)................................... 20, 25

*In re Energy Future Holdings Corp.*, 648 F. App'x 277 (3d Cir. 2016)................................ 40

*In re Exaeris, Inc.*, 380 B.R. 741 (Bankr. D. Del. 2008) ............................................. 46

*In re Food Barn Stores, Inc.*, 107 F.3d 558 (8th Cir. 1997) ......................................... 43

*In re Hagood Reserve, LLC*, 2010 WL 5067444 (Bankr. W.D.N.C. 2010)................................ 22

*In re HDR Holdings, Inc.*, 2020 WL 6561270 (D. Del. Nov. 9, 2020)................................. 45

*In re Heritage Highgate, Inc.*, 679 F.3d 132 (3d Cir. 2012) ......................................... 16

*In re ICL Holding Co., Inc.*, 802 F.3d 547 (3d Cir. 2015) ........................................... 37

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009).............................. 37, 48

*In re Ionosphere Clubs, Inc.*, 184 B.R. 648 (S.D.N.Y. 1995)......................................... 40

*In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007)........................................... 42

*In re Kane*, 628 F.3d 631 (3d Cir. 2010).......................................................... 31

*In re Martin*, 91 F.3d 389 (3d Cir. 1996)..................................................... *passim*

*In re Marvel Entertainment Group, Inc.*, 140 F.3d 463 (3d Cir. 2004) ................................. 8

*In re Moisuc*, 2017 WL 2633428 (E.D. Pa. June 19, 2017) .............................................. 1

*In re NJ Affordable Homes Corp.*, 2006 WL 2128624 (Bankr. D.N.J. June 29, 2006) ..................... 39

*In re Nordlicht*, 115 F.4th 90 (2d Cir. 2024)....................................................... 33

*In re Nortel Networks, Inc.*, 522 B.R. 491 (Bankr. D. Del. 2014) .................................... 41

*In re Nutraquest, Inc.*, 434 F.3d 639 (3d Cir. 2006) ................................................. 1

*In re Paragon Offshore plc*, 2022 WL 1055574 (3d Cir. Apr. 8, 2022) ................................ 27

*In re Prospector Offshore Drilling S.a R.L.*, 2019 WL 1150563 (D. Del. Mar. 12, 2019)............. 27, 28

*In re Pursuit Cap. Mgmt., LLC*, 874 F.3d 124 (3d Cir. 2017) .................................... *passim*

*In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000) ......................................... *passim*

*In re QSR Steel Corp., LLC*, 2024 WL 5165206 (Bankr. D. Conn. Dec. 17, 2024) .................................. 43

*In re Reading Broad., Inc.*, 386 B.R. 562 (Bankr. E.D. Pa. 2008)........................................................... 44

*In re Revel AC, Inc.*, 802 F.3d 558 (3d Cir. 2015) .................................................................................. 32

*In re Rothman*, 2024 WL 695753 (Bankr. D.N.J. Feb. 20, 2024)........................................................... 48

*In re Southland Royalty Co. LLC*, 623 B.R. 64 (Bankr. D. Del. 2020)................................................... 34

*In re Stream TV Networks, Inc.*, Bankr. D. Del. 21-10848 ......................................................................4

*In re Summit Glob. Logistics, Inc.*, 2008 WL 819934 (Bankr. D.N.J. Mar. 26, 2008) ........................... 43

*In re Team Sys. Int'l, LLC*, 2024 WL 5008854 (D. Del. Dec. 6, 2024) .................................................... 28

*In re Tempo Tech. Corp.*, 202 B.R. 363 (D. Del. 1996).......................................................................... 24

*In re Thorpe*, 540 B.R. 552 (E.D. Pa. 2015) ............................................................................................1

*In re Tower Automotive Inc.*, 241 F.R.D. 162 (S.D.N.Y. 2006) .............................................................. 41

*In re TWA, Inc.*, 322 F.3d 283 (3d Cir. 2003) ........................................................................................ 32

*In re Whitehall Jewelers Holdings, Inc.*, 2008 WL 2951974 (Bankr. D. Del. July 28, 2008) .................. 35

*In re Williamsburg Boutique LLC*, 663 B.R. 217 (Bankr. S.D.N.Y. 2024) ......................................... 33, 34

*In re Wilson*, 563 B.R. 519 (E.D. Pa. 2016).................................................................................... 27, 28

*Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490 (3d Cir. 1998) .............................. 20

*Matter of Cajun Elec. Power CO-OP., Inc.*, 119 F.3d 349 (5th Cir. 1997) .............................................. 41

*Pittsburgh Food & Beverage, Inc. v. Ranallo*, 112 F.3d 645 (3d Cir. 1997)....................................*passim*

*In re Revstone Industries LLC*, 690 F.App'x 88 (3d Cir. 2017) ............................................................. 27

*In re Scimeca Found., Inc.*, 497 B.R 753 (Bankr. E.D. Pa. 2013). ..................................................... 33, 45

*Travelers Ins. Co. v. U.K. Porter Co.*, 45 F.3d 737 (3d Cir. 1995) ......................................................... 27

*United States v. Whiting Pools, Inc.*, 462 U.S. 198 (1983) .................................................................... 31

*Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233 (3d Cir. 2001).................................. 31

## Statutes and Rules

8 Del. C. § 225 ..........................................................................................................................................3

11 U.S.C. § 541 ...................................................................................................................................... 30

11 U.S.C. § 726 ...................................................................................................................................... 28

11 U.S.C. § 361 ...................................................................................................................................... 49

11 U.S.C. § 363 ..............................................................................................................................*passim*

11 U.S.C. § 1109 .................................................................................................................................... 28

18 U.S.C. § 1832 ............................................................................................................................... 47, 48

Fᴇᴅ. R. Bᴀɴᴋʀ. P. 8014 ............................................................................................................................ 29

Fᴇᴅ. R. Bᴀɴᴋʀ. P. 9019 ............................................................................................................................ 37

## COUNTERSTATEMENT OF ISSUES ON APPEAL

1.    Whether the Appeals should be dismissed as moot, where the Appellants did not obtain a stay of the Sale pending appeal, the Buyer was a good faith purchaser, and reversal or modification of the Sale Order will impact the Sale's validity, and whether VSI's appeals should be dismissed because it lacks standing to appeal?

SUGGESTED ANSWER:    Yes.

2.    Whether the Bankruptcy Court properly approved the Settlement, where it satisfied the *Martin* factors and was well within the range of reasonableness?

SUGGESTED ANSWER:    Yes.

3.    Whether the Bankruptcy Court properly approved the Bidding Procedures, where they were fair, reasonable, and designed to maximize the value of the assets?

SUGGESTED ANSWER:    Yes.

4.    Whether the Bankruptcy Court properly approved the Sale, where it transferred only Debtor-owned assets and equity interests, and the APA makes clear all Rembrandt intellectual property was excluded?

SUGGESTED ANSWER:    Yes.

5.    Whether the Bankruptcy Court properly approved the Sale, where it satisfied all requirements under Section 363(b) of the Bankruptcy Code?

SUGGESTED ANSWER:    Yes.

## STANDARD OF APPELLATE REVIEW

When considering bankruptcy court appeals, the district court reviews questions of law de novo, findings of fact for clear error, and exercises of discretion for abuses thereof. *In re Thorpe*, 540 B.R. 552, 560 (E.D. Pa. 2015). The bankruptcy court has considerable discretion in approving settlements under Rule 9019 and sales under section 363. *See In re Culp*, 545 B.R. 827, 844 (D. Del. 2016); *In re Martin*, 91 F.3d 389, 391 (3d Cir. 1996). A bankruptcy court's order approving a settlement or sale will only be overturned if it was an abuse of discretion. *See In re Moisuc*, 2017 WL 2633428, at *6 (E.D. Pa. June 19, 2017). The question of whether the proper test for approval

was applied is reviewed de novo.  *See In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006).

## STATEMENT OF THE CASE

On December 9, 2024, after notice to all potentially interested parties and several hearings, the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court") entered an order (the "Sale Order," RA25-RA107[1]) approving the sale (the "Sale") of substantially all assets (the "Assets") of Debtors Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc. ("Technovative," and together with Stream, the "Debtors") to SeeCubic, Inc. ("SeeCubic").  The Sale Order authorized the Sale as contemplated by a prior Bankruptcy Court order (the "Settlement Order," RA7-RA9) approving a settlement between the Trustee and Hawk Investment Holdings, Ltd. ("Hawk") as collateral agent for the secured noteholders of SeeCubic (the "Settlement").

As aptly summarized in the Bankruptcy Court's opinion in support of the Sale Order (the "Sale Opinion," RA1851-1871), both the Sale and the Settlement were extensively litigated, leading the Bankruptcy Court to hold that: 1) "the Settlement represented a valid exercise of the Trustee's business judgment, was informed by extensive research, investigation, and negotiation by the Trustee, and was in the best interests of the Debtors' estates and all stakeholders" and 2) "given the posture and circumstances of the Debtors and these cases, the Trustee satisfied his fiduciary duties in reaching the Settlement, marketing the Assets for sale, and declaring the . . . winning bid . . . . The Trustee has sound business justification for the Sale, and he is faced with non-operational Debtors, enormous liabilities, and little funding."  RA1854, RA1869-RA1870.

The Sale Opinion, which is amply supported by record citation, provides an accurate and

---

[1] References herein to: 1) "RA__" refer to the Appendix filed by Rembrandt (E.D. Pa. 24-cv-2727, D.I. 18 through 18-2); 2) "VSIA__" refer to the Appendix filed by VSI (E.D. Pa. 24-cv-6397, D.I. 16-1 through 16-6); and "TA__" refer to the Appendix being filed by the Trustee contemporaneously herewith.

complete discussion of the dispositive facts underlying Rembrandt 3D Holding, Ltd. ("Rembrandt") and Visual Semiconductor, Inc.'s ("VSI," together with Rembrandt, "Appellants") instant appeals of the Sale Order, the Settlement Order, and several orders ancillary thereto.  The Trustee provides the following additional discussion with further context, which may be helpful to this Court.

**A.     After Extensive "Acrimony" and "Relative Lack of Progress," The Bankruptcy Court Takes The Extraordinary Measure of Appointing a Chapter 11 Trustee**

On March 15, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), with the cases jointly administered under E.D. Pa. Bankr. No. 23-10763.  On January 5, 2024, after almost a year of "acrimony" and "relative lack of progress" while the Debtors were under the control of CEO Mathu Rajan, the Bankruptcy Court issued an opinion (the "Trustee Opinion," TA69-146) and entered an order which appointed a Chapter 11 trustee and granted Hawk relief from the automatic stay to permit litigation against the Debtors pending in the Delaware Court of Chancery under 8 Del. C. § 225 (the "225 Action") to proceed.

**B.     Rajan, VSI, and Rembrandt's History of Collusive Actions**

As established by the Trustee Opinion (which was not appealed by any party and which was adopted in full by the Sale Opinion), Rajan formed co-Appellant VSI in 2022, "purportedly as a vehicle to raise new capital and support Stream.  Upon formation, Mr. Rajan was the CEO of VSI. " TA74 (Trustee Opinion at 6).  The Bankruptcy Court found that Rajan – operating on his own accord and through VSI – was conspiring with co-Appellant Rembrandt to derail the orderly progress of the Debtors' bankruptcy proceeding while committing gross mismanagement, breach of fiduciary duty, and rampant self-dealing.  TA99, 129 (*id.* at 31, 61); *see also* TA117-19 (*id.* at

49-51, detailing the Bankruptcy Court's concerns with the Debtors' unauthorized post-petition licensing covenant with Rembrandt, which had "the taint of benefit to VSI without clear benefit to the Debtors and their estates").  In the Trustee Opinion, the Bankruptcy Court found, *inter alia*, that: (i) the Debtors, under the watch and leadership of Rajan, breached their fiduciary duties to creditors and disclosure obligations to the Bankruptcy Court in failing to disclose that VSI had made millions of dollars of payments on behalf of the Debtors in return for Debtor stock; (ii) Debtors' management, specifically Rajan, contemporaneously and improperly acted as a fiduciary of the Debtors and VSI; (iii) "Alarmingly, the interrelationship between VSI, Stream, and Mr. Rajan's overlapping interests and roles in each is so entrenched that Mr. Rajan's testimony . . . was at times rendered unintelligible, or alternatively, intentionally deceptive, by his inability or unwillingness to draw distinctions between the entities and his roles with each"; and (iv) "Mr. Rajan's conflicted interests, gamesmanship, and lack of candor to the Court and creditors rises to the level of gross mismanagement of the estates, even when viewed against the high standard of glaring and inexcusable badness."  TA128-29 (Trustee Opinion at 60-61).

      **i.**      **The Prior Bankruptcy Cases**

This is the third bankruptcy case in which Rajan (first through an entity controlled by him named "VTI" and next through VSI) has attempted to confiscate Stream assets for himself at the expense of the Debtor's creditors, and the second bankruptcy case in which Rembrandt colluded with Rajan to accomplish that untoward result.  The first was a Chapter 11 case initiated by Stream on February 24, 2021, and docketed at *In re: Stream TV Networks, Inc.*, Bankr. D. Del. No. 21-10433-KBO (the "Delaware Voluntary Bankruptcy Case") and the second was an involuntary Chapter 7 case initiated on May 23, 2021, by, *inter alia*, colluding creditor Rembrandt, docketed at *In re Stream TV Networks, Inc.*, Bankr. D. Del. 21-10848 (the "Delaware Involuntary

Bankruptcy Case"). *See* TA74 (Trustee Opinion at 6); TA255 (Bankr. D.I. 835, p.4, n.3).

The Delaware Bankruptcy Court dismissed the Delaware Voluntary Bankruptcy Case on May 17, 2021, as having been filed in bad faith in an attempt to divert the Debtors' assets to Rajan and VTI. *See* TA74 (Trustee Opinion at 6); TA261 at ¶ 40. On May 23, 2021, just six days later, the Stream TV Debtor, Rajan, Rajan's brother Raja, and Rembrandt executed a collusive settlement agreement (the "Rembrandt Agreement") to grant Rembrandt creditor status in a ruse to circumvent the dismissal of the Delaware Voluntary Bankruptcy Case. *See* TA394-405 (Bankr. D.I. 835, Ex. E). On May 23, 2021, the same day that Mr. Rajan executed the Rembrandt Agreement on his own behalf and on behalf of Stream, Rembrandt (as one of three petitioning creditors) filed the Delaware Involuntary Bankruptcy Case against Stream, with the timing of the filing substantiating the concern that the Rembrandt Agreement was a sham concocted by Mr. Rajan and Rembrandt to fix a contrived claim for Rembrandt to end-run the Delaware Bankruptcy Court's dismissal of the Delaware Voluntary Bankruptcy Case. *See* TA263 (Bankr. D.I. 835 at ¶¶ 46-47). Not fooled, the Delaware Bankruptcy Court again dismissed Stream's involuntary bankruptcy proceeding as a bad faith filing, and imposed a twelve-month bar on Stream re-filing for bankruptcy. TA74 (Trustee Opinion at 6).

### ii.    Rembrandt's Suspect Claims

On the Petition Date, Technovative scheduled Rembrandt as its only creditor having a "breach of contract" claim in the amount of $10 million (+) and listed the claim as contingent, unliquidated, and disputed and, thus, not an allowed claim. *See* TA263 (Bankr. D.I. 835 at ¶ 48) (citing TA693). Without explanation, a mere two (2) weeks later, when Technovative filed its Schedules of Assets and Liabilities, Rembrandt's claim ballooned to $100 million dollars, more than ten (10) times the original amount, and was listed by Rajan as undisputed,  noncontingent,

and liquidated, and therefore, an "allowed" claim for "goods and services." *See* TA263 at ¶ 49 (citing TA707). Even more suspect is that Stream, which Rembrandt alleges is the counterparty to the Settlement Agreement, failed to even include a claim for Rembrandt in its bankruptcy schedules.

### iii.    Transactions That Benefitted VSI and Rembrandt

In addition to the transactions detailed above, there are a number of other problematic transactions between the Debtors, VSI, and Rembrandt – all of which have the taint of unfaithful fiduciary Rajan's involvement. Of particular concern were the proposed major transactions benefitting VSI, which the Bankruptcy Court has also criticized:

> The Court has had concerns nearly from the inception of these cases about the relationship between the Debtors and VSI, given Mr. Rajan's overlapping roles. Certain transactions the Debtors have proposed have only reinforced that concern. As discussed *supra*, the proposed funding transaction with VSI in April would have unnecessarily either issued Stream equity to VSI or created $1 million of administrative debt to VSI. It was therefore denied. The unauthorized post-petition issuance of shares in Stream to VSI also raises serious questions about the administration of these cases for the benefit of VSI. These, however, were not the only instances where the Court's trust in the Debtor's management has deteriorated in light of transactions the Debtors have proposed either at the eleventh hour or under cover of more innocuous requests for relief that seem to benefit VSI without justification.

TA114 (Trustee Opinion at 46).

A post-petition licensing covenant with Rembrandt (the "Rembrandt License Covenant"), like the illicit agreements with VSI, was also entered into by Rajan without Bankruptcy Court approval. The Rembrandt License Covenant clearly prioritized VSI's interests over the interests of the Debtors and their subsidiaries by expressly barring Rembrandt from issuing licenses to any of Stream's subsidiaries. TA117-18 (*id.* at 49-50). Indeed, the Rembrandt License Covenant was "intended, at least in large part, to protect VSI's interest in Stream's technology and products, while at the same time expressly barring Rembrandt from issuing a license to any of Stream's

6

subsidiaries.  The Licensing Agreement completely aligns Stream and VSI with respect to licensing the  technology of Rembrandt, to the exclusion of, *inter alia*, Stream's subsidiaries." TA118 (*id.* at 50).

### iv.    Rajan's History of Untrustworthiness

Throughout these bankruptcy cases, it has been established that Rajan and the parties he controls cannot and should not be trusted.  To that end, the Bankruptcy Court went to great lengths in the Trustee Opinion to stress that it was highly concerned with Rajan's "plans, trustworthiness, and motivations . . . in his role as, for all intents and purposes, the singular figure in the Debtors' management," detailing numerous issues with Rajan's leadership, including his lack of "ability or willingness to act consistent with the fiduciary duties the Debtors owe their creditors and the Court." TA99 (Trustee Opinion at 31).  The Bankruptcy Court pointed directly to numerous events that highlighted Rajan's lack of leadership and untrustworthiness, including several concerning hundreds of millions of dollars in purchase orders and financing the state of which was misrepresented by Rajan.  TA103-06, 110-11, 119-28 (*id.* at 35-38, 42-43, 51-60).  Ultimately, the result of Rajan's administration of the Debtors was "delay, confusion, mistrust, and unending acrimony that has led to the Court's assessment that, even if the Debtors have a reasonable likelihood of rehabilitation, they have made little progress to date in attaining it under Mr. Rajan's stewardship." TA129 (*id.* at 61).

### C.    The Trustee is Appointed and Conducts a Fulsome Investigation, Finding That VSI Continued the Unapproved Use of the Debtor's Assets

Mr. Homony's appointment as Chapter 11 Trustee was approved by the Bankruptcy Court on January 12, 2024.  RA1852 (Sale Opinion at 2).  As acknowledged by the Bankruptcy Court, Mr. Homony's appointment is "an extraordinary remedy, representing a rare exception to the rule that the [Chapter 11] debtor remains in possession throughout its reorganization because current

management 'is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests in the estate.'"  TA138 (Trustee Opinion at 70, quoting *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 2004)).

To determine the best course of action for the Debtors' stakeholders, the Trustee (1) completed a comprehensive investigation of the Debtors' financial affairs, (2) consulted with his professionals, Debtors' subsidiaries, Rajan, VSI, Rembrandt, and Debtors' secured creditors, (3) evaluated the significant legal and factual hurdles of the 225 Action, which was pending at the time of the Trustee's appointment and put at substantial risk Debtors' assets and any creditor recovery, and, (4) evaluated the need to fund the operations of the Debtors' research and development subsidiary SCBV, and potential sources of that funding.  *See, e.g.,* TA150-54 (Bankr. D.I. 630 at pp. 4-8); RA154-177 (the Trustee testifies in support of the Settlement); TA423-28 (Homony Declaration at ¶¶ 10-13).

### D.      VSI and Rembrandt's Prior "Offers"

From the outset of the Trustee's appointment, in good faith, the Trustee solicited and entertained proposals from VSI and Rembrandt to fund SCBV's operations, fund a Plan, and/or acquire the Debtors' assets; however, the "offers" presented were illusory at best and without any verified or committed source of funding.  *See, e.g.,* RA1866 (Sale Opinion at 16, "the Trustee proposed to VSI that it provide financing . . ., but VSI failed to do so"); RA154-177 (the Trustee testifies in support of the Settlement); RA189 (*id.* at 82:8-18, "I came into this with an open mind. Mathu had [a] fair and equal opportunity, Rembrandt had a fair and equal opportunity, and Hawk had a fair and equal opportunity to present me with whatever they thought was . . . the best proposal that . . . would resolve everything and provide some recovery . . . . VSI has just never come forward with anything that's credible."); TA271-73 (Bankr. D.I. 835 at ¶¶ 86-94); TA424-27 (Trustee

declaration in support of Sale). The Trustee and his advisors were given no reason to believe that VSI's proposals were feasible - VSI has repeatedly failed to show that it has the money or backing to consummate any proposal, instead relying on purchase orders already dismissed by the Bankruptcy Court as hyperbole or fabrication. *See* TA271-73 (Bankr. D.I. 835 at ¶¶ 86-94); TA123-26 (Trustee Opinion at 55-58).

Rembrandt's proposals have been even more ethereal than VSI's, as it has never made a true purchase offer. *See* TA272 (Bankr. D.I. 835 at ¶¶ 91-94). Indeed, Rembrandt repeatedly failed to present the Trustee with firm terms, commit to hard numbers, or present a valuation of the Debtors' Assets. *Id.* While Christopher Michaels, Rembrandt's CFO and attorney , initially claimed its investors had $70 million to invest in Stream, Rembrandt never made an offer. *Id.* Further, despite Rembrandt's allegedly continued interest, it neither looked at the Assets nor went into the Debtors' data room. *Id.* The Trustee has continually urged VSI and Rembrandt to submit formal proposals and even to meet with Hawk, yet neither did. *Id.*

### E. The Hawk Settlement

The foregoing efforts led the Trustee to the determination that, in the exercise of his reasonable business judgment, a settlement with Hawk which facilitated the marketing and sale of the Assets was in the best interests of the Debtors' varied stakeholders. Accordingly, on May 6, 2024, the Trustee filed a Motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure to approve the Settlement (the "Settlement Motion," TA147-163, Bankr. D.I. 630). As set forth in detail in the Settlement Motion, the proposed Settlement would provide millions of dollars in funding for the benefit of the Debtors' estates and, absent a settlement, litigation of the 225 Action "would require extensive and extremely expensive continuing litigation in the Delaware, Chancery Court, the Delaware Supreme Court, [the Bankruptcy] Court and perhaps

other courts[,] the outcome of which is unpredictable" and would require "the Debtor [to] overcome significant factual and legal challenges." TA150-51 (Settlement Motion at ¶ 23). More specifically, the Settlement provided for:

(a)    an allowed secured claim for Hawk in the amount of $180 million (the "Allowed Secured Claim"), subject to a dollar-for-dollar increase for any amounts funded to SCBV, between the appointment of the Trustee and closing on a sale of the Debtors' assets;

(b)    SeeCubic's ability to credit bid $150 million of its secured claim in the Sale of the Debtors' Assets, with no bid protections (the "Stalking Horse Bid");

(c)    the asserted secured claims of SLS Holdings VI, LLC and SeeCubic were to be withdrawn upon the entry of an order approving the Settlement Motion;

(d)    the Trustee would seek approval of certain bid procedures in connection with the Sale (the "Bid Procedures"); and

(e)    the Debtors' estates would receive a carve-out from the Sale proceeds in the amount of $7.5 million in cash, plus 10% of each dollar in excess of the Stalking Horse Bid, as well as the rights to a $1 million bond the Debtors posted in the 225 Action.

*See* RA1853-54 (Sale Opinion at 3-4).

The Trustee's Settlement Motion was vigorously opposed by Rembrandt and VSI, with Rembrandt arguing, *inter alia*, that the Settlement would violate both the Philips and Rembrandt licenses and that the Trustee's proposed compromise should not go forward due to the Rembrandt Agreement. *See* RA1854 (Sale Opinion at 4, citing Bankr. D.I. 642 [VSI's 9019 objection], Bankr. D.I. 643 [Rembrandt's 9019 objection]). The Bankruptcy Court conducted an evidentiary hearing on the Settlement Motion on June 5, 2024, at which the Trustee presented evidence to establish that the Settlement satisfied the *Martin*[2] factors, established the facts and reasoning that had informed his decision, and was cross-examined by both VSI and Rembrandt. *See* RA108-203 (transcript of 6/5/24 hearing). Specifically, the Trustee testified:

---

[2] *See In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996).

- He is a certified insolvency and restructuring advisor with nearly twenty-five years of experience focused on bankruptcy and restructuring matters, RA154-55 (*id.* at 47:24-48:16);

- "[E]arly on" in his appointment, he endeavored to "evaluate the Debtor's operations, its assets, the parties' positions, . . . interview them, sit down, communicate, and try to figure out a path forward for these cases . . . [as] an independent fiduciary tasked with trying to recover and maximize the value of assets for creditors" and that, despite the damning findings in the Trustee Opinion, he was "open-minded in meeting with Mr. Rajan, listening to his side of the story, negotiating a potential resolution . . . [and] came in with an open mind and tried to assess for myself his credibility," RA156 (*id.* at 49:9-24);

- He "met with . . . Rembrandt, VSI, Stream representatives multiple times before any terms of any settlement were reached with Hawk," RA157 (*id.* at 50:15-20);

- The Debtors had no funds and the lack of funds was endangering the value of the Debtors' subsidiaries, RA161-63 (*id.* at 54:15-55:1, 56:2-3); and

- He consulted with litigation counsel regarding the 225 Action and other matters and ended up "satisfied that the litigation approach to this matter wouldn't result in a meaningful distribution to the creditors and [would] possibly put at risk the existing assets of the Debtor," RA166 (*id.* at 59:2-21).

Ultimately, the Bankruptcy Court entered the Settlement Order over the objections of VSI and Rembrandt, holding that the "Settlement represents a valid exercise of the Trustee's business judgment, having been informed by extensive research, investigation, and negotiation by the Trustee and other parties in interest[]" and that the "Settlement and [underlying] Agreement are in the best interest of the Debtors' estates and all of the Debtors' stakeholders." RA8 (Settlement Order at ¶¶ 4, 7).

Rembrandt appealed the Settlement Order (RA1-6), and that appeal is pending with this Court under E.D. Pa. No. 24-cv-2727. VSI filed a motion to reconsider the Settlement Order (VSIA74-113), which was considered by the Bankruptcy Court at a November 7, 2024, hearing (RA204-226) at which the Trustee's bankruptcy and litigation counsel reiterated the reasons for proceeding with the Settlement and Sale. *See* RA209-RA212. The motion for reconsideration

was ultimately denied (VSIA802-06) and VSI's appeal of the same is pending with this Court under E.D. Pa. No. 24-6397.

### F.    The Sale Motion and Bid Procedures

As contemplated by the court-approved Settlement, on September 30, 2024, the Trustee filed a motion with the Bankruptcy Court seeking authorization and approval of the stalking horse asset purchase agreement (the "Stalking Horse APA") and the bid procedures (the "Bid Procedures") in connection with the sale of substantially all of the Debtors' assets (the "Sale Motion," RA996-1031). The Sale Motion explicitly stated that the Trustee did not intend to sell or assign the Rembrandt License as a part of the Stalking Horse APA. RA1003 (Sale Motion at ¶ 27, "The Trustee does not intend to sell or assign the Rembrandt License . . . ."). Likewise, on November 11, 2024, the Trustee filed a proposed Asset Purchase Agreement, which made it abundantly clear that the following were to be deemed "Excluded Assets" which were not part of the Debtor assets the Trustee sought to sell:

> (j)    any grant of rights or license by Rembrandt 3D Holding Ltd. ("Rembrandt") or affiliates to Stream, including but not limited to the Rembrandt Grant of Rights in the Settlement Agreement and Mutual Release between Rembrandt and Stream dated May 23, 2021, any amendment thereto, and the Licensing Covenant between Rembrandt, Stream, and Visual Semiconductor, Inc. dated August 14, 2023, each to the extent valid, existing and enforceable as determined by a final, non-appealable order from a court of competent jurisdiction;
>
> (k)    any physical assets that contain or include Rembrandt Intellectual Property, to the extent valid, existing and enforceable as determined by a final, non-appealable order from a court of competent jurisdiction . . . .

TA213-14 (Bankr. D.I. 795-1 at § 2.2).

Like the Settlement Motion, the Sale Motion was vigorously opposed by Rembrandt and VSI. *See, e.g.,* VSIA245-778 (VSI's objection to Sale Motion); RA1032-1066 (Rembrandt's objection to Sale Motion). Despite the foregoing statements making it clear that Rembrandt's

assets were excluded from the deal, both objections were based on the argument that the proposed sale would include IP belonging to Rembrandt and that the Trustee had failed to remove Rembrandt IP from the assets for sale. *See* RA1033 at ¶ 1; VSIA270 at ¶ 46.

The Sale Motion also sought approval of the Bid Procedures as the initial step in the Sale Process. RA1856 (Sale Opinion at 6). Appellants objected to the Bid Procedures on "a litany of grounds," many of which had already been decided by the Bankruptcy Court in connection with the Settlement Order, with the thrust of their arguments revolving around property they claimed belonged to Rembrandt (which, as made clear above, was excluded from the Sale). RA1857-59 (*id.* at 7-9). The Bankruptcy Court held a hearing on the Bid Procedures on November 13, 2024 (RA227-310), and in response to the objections raised by the Appellants, directed the parties to jointly supplement the list of assets to be sold in connection with the Stalking Horse Bid, including Rembrandt's desired disclaimers regarding the Trustee's alleged ability to sell such Assets and potential criminal liability for potential purchasers. RA1859-60 (Sale Opinion at 9-10).

The Bankruptcy Court entered the order approving the Bidding Procedures on November 20, 2024 (RA1625-60, the "Bidding Procedures Order"), finding them fair, reasonable, and appropriate under the circumstances to maximize the value of the Assets. VSI filed a notice of appeal to the Bidding Procedures Order, with the appeal pending in this Court under E.D. Pa. No. 24-cv-6498.

The Bidding Procedures Order set a deadline of November 22, 2024, for the filing of objections specifically to the sale of the Debtor's Assets and a deadline of November 29, 2024, for the filing of responses to any objections. RA1629 at ¶¶ 4-5. On November 22, 2024, VSI and Rembrandt filed their objections, which improperly reargued the merits of the Settlement and deflected attention from the conspiratorial and collusive actions of Rajan, VSI, and Rembrandt,

ignoring the Bankruptcy Court's observations about Rajan's spectacular failures as a fiduciary as reflected in the Trustee Opinion. *See* VSIA927-1059 (VSI objection); Bankr. D.I. 816 (Rembrandt Objection).

On December 2, 2024, after the bid deadline had passed, the Trustee filed a notice stating that no qualified bids were received by the bid deadline and therefore that the auction was canceled with the stalking horse bid by SeeCubic declared the successful bid for the assets, and that the Trustee would seek final approval of the Sale at a previously scheduled December 4, 2024 hearing. TA421-22. In advance of the hearing, the Trustee filed a declaration (TA423-428) stating that the proposed Sale to SeeCubic was, in his business judgment, the best outcome for the Debtors and averring, *inter alia*, that:

- In the wake of the Bankruptcy Court's approval of the Settlement, SSG Capital Advisors, LLC ("SSG") was approved by the Bankruptcy Court as the Trustee's investment banker to market the assets for sale, TA426 at ¶ 17;

- The Trustee had agreed to postpone the filing of a motion concerning bid procedures "in one last effort to provide VSI an opportunity to present a viable proposal that would provide for an alternative path forward for the Debtors and a better result for creditors. In spite of my ongoing efforts to engage with parties in an effort to maximize creditor recoveries, VSI never made a proposal to buy the Assets . . . ." *Id.*;

- "SSG sent a 'Teaser' containing relevant information about the Debtors and the Assets to over 550 potential financial and strategic targets with the intention of creating interest in the Assets and to get interested parties to engage in a diligence process upon the execution of a non-disclosure agreement, which would provide more detailed information from SSG's data room regarding the Assets and the ability to ask questions of parties with more familiarity with the Assets, their capabilities and prospects," TA427 at ¶ 19;

- "SSG followed up with potential targets for a period of weeks after the Teaser was sent out but received limited responses . . . and as of the bid deadline . . . no bids were submitted," *id.* at ¶ 20; and

- "The bid procedures, sale process, and relief being requested from [the Bankruptcy] Court in connection with the sale of the Debtors' Assets are consistent with numerous other cases I have been involved with throughout my professional career and are appropriate under the circumstances of these bankruptcy cases." *Id.* at ¶ 22.

14

J. Scott Victor – Managing Director of SSG – also submitted a declaration (TA429-35) elaborating on the sale procedures and averring that:

- "SSG has become highly familiar with the Debtors' corporate and capital structure, management, and assets," TA432 at ¶ 13;

- "the Debtors had no operations, no factories, no workers, no inventory, [and] no raw materials," *id.* at ¶ 15;

- "SSG was responsible for complying with the Court's directive to prepare a full list of assets available in the sale process, including intellectual property owned by the Debtors' subsidiaries, and to allow VSI and Rembrandt to add additional information to the list of assets. The list, inclusive of the VSI and Rembrandt comments, was filed with the Court and on the Docket," TA434 at ¶ 26;

- "It is important to note that the Trustee and SSG never offered the assets of the Debtors' subsidiaries [which Rembrandt and VSI allege incorporate aspects of Rembrandt's intellectual property] to anyone free and clear of any interests, as those assets do not constitute property of the Debtors' estates. Rather, the equity interests in the downstream entities are assets of the Debtors' estates and are being sold as part of this sale process," *id.* at ¶¶ 28-29;

- "Any rights Rembrandt may have as to its alleged intellectual property are preserved against the proposed Stalking Horse Bidder; and further, Rembrandt has a suit pending in Delaware, where those issues are currently being litigated against the Stalking Horse Bidder," *id.* at ¶ 30; and

- "Based upon my experience, the Stalking Horse Bid represents the highest and best bid for the Debtors' assets. Further, based on my efforts and those of my team at SSG, the sale process was fair, honest, and generated the highest and best value that could be obtained for the Debtors' assets under the circumstances," *id.* at ¶ 31.

On December 9, 2024 – after consideration of Appellants' evidence and arguments at numerous hearings and in voluminous written submissions – the Bankruptcy Court entered the Sale Order, which detailed the Trustee's successful efforts to marshal and sell Debtor assets for the benefit of creditors and approved the sale of those assets to SeeCubic pursuant to the APA. RA25-107. In the Sale Order, the Bankruptcy Court found, *inter alia*, that:

- The Trustee "afforded a full, fair, and reasonable opportunity for any interested party to make a higher or otherwise better offer to purchase the Assets," RA29 (Sale Order at ¶ H);

- "The Trustee and the Buyer have negotiated and undertaken their roles leading to the entry into the Asset Purchase Agreement in a diligent, non-collusive, fair, reasonable, and good faith manner and at arms' length," RA30 (*id.* at ¶ J);

- "The sale process conducted by the Trustee pursuant to the Bidding Procedures Order and the Bidding Procedures resulted in the highest or otherwise best value for the Assets for the Trustee and the Debtors' estates, their creditors, and all parties in interest, and any other transaction would not have yielded as favorable a result," *id.* at ¶ L;

- "The Trustee has demonstrated good, sufficient, and sound business reasons and justifications for entering into the Sale and the performance of its obligations under the Asset Purchase Agreement. The consummation of the Sale contemplated by the Asset Purchase Agreement is in the best interests of the Debtors, their creditors, their estates, and other parties in interest," *id.* at ¶ M;

- "the Trustee, on behalf of each Debtor, has all of the power and authority necessary to (i) execute and deliver the Asset Purchase Agreement and all other documents to consummate the Sale, and (ii) consummate the Sale, and no further consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, are required for the Trustee to consummate the transactions contemplated by the Asset Purchase Agreement, except as otherwise set forth in the Asset Purchase Agreement. The Assets constitute property of the Debtors' respective estates within the meaning of section 541(a) of the Bankruptcy Code and title thereto is presently vested in the Debtors' estates," RA35-36 (*id.* at ¶ AA); and

- "The Trustee has demonstrated a sufficient basis and compelling circumstances warranting his to (i) entry into the Asset Purchase Agreement, and (ii) sale of the Assets, and such actions are an appropriate exercise of the Trustee's business judgment and in the best interests of the Debtors, their estates, and their creditors. Such business reasons include that (i) the Asset Purchase Agreement constitutes the highest and best offer for the Assets; (ii) the Asset Purchase Agreement presents the best opportunity to maximize and realize the value of the Assets for the benefit of the Debtors, their estates, and their creditors; and (iii) unless the Sale contemplated by the Asset Purchase Agreement is concluded expeditiously, creditor recoveries are likely to be adversely affected," RA36 (*id.* at ¶ BB).

Moreover, the Bankruptcy Court found that the claims of Rembrandt, if any, were adequately protected by the court's decision, which acknowledged that any claim was adequately protected and that pending litigation between the Buyer and Rembrandt was permitted to proceed. RA36-37 (*id.* at ¶¶ DD); RA44 (*id.* at ¶ 12, "For the avoidance of doubt, Rembrandt . . . is not an Enjoined Party with respect to claims it purports to have against the Buyer related to Rembrandt Intellectual Property alleged to be part of the Transferred Assets.")

16

Rembrandt and VSI filed a joint notice of appeal of the Sale Order (Bankr. D.I. 877), with the appeal docketed under E.D. Pa. No. 24-6617.  On January 8, 2025, the Bankruptcy Court issued the Sale Opinion pursuant to Local Bankruptcy Rule 8001-1 in support of the Sale Order.  The Bankruptcy Court held, among other things, that:

- "Rembrandt focused [at the December 4, 2024 Sale Hearing] on what Assets were being sold and whether they included Rembrandt's intellectual property.  The APA, however, made clear that such intellectual property was an Excluded Asset.  As the Court observed at the Sale Hearing multiple times, the Assets to be sold 'are what they are,' and were set forth in the APA and its schedules.  SeeCubic agreed to purchase those Assets on an 'as is, where is' basis, and to the extent Rembrandt believes SeeCubic's use of the Assets after closing violates its rights, litigation against the purchaser is not barred," RA1867-68 (Sale Opinion at 17-18);

- "Nothing in the Blumenthal Declaration [submitted by Rembrandt at the Sale Hearing] undermines the Sale process. . . . Mr. Blumenthal does reiterate Rembrandt's argument that Stream's UltraD technology is dependent on Rembrandt's and Philips' technology, and that because Stream's licenses from Rembrandt and Philips are not transferable, SeeCubic's failure to obtain new licenses will render the Assets worthless. . . . The Court, however, dispensed with this argument at the Sale Hearing, finding that the Sale, with the exception of a piece of bonding equipment located in China, is a deal for Technovative's equity stake in certain non-debtor subsidiaries, and to the extent Rembrandt believes that the sale violates its intellectual property rights, its litigation claims are preserved," RA1869 (*id.* at 19); and

- "Finally, the Court finds that the Assets may be sold free and clear of any interests of third parties pursuant to § 363(f). Rembrandt asserts it (and Philips) has intellectual property that may not be transferred to SeeCubic.  To the extent those rights exist, they are excluded under the APA.  To the extent Rembrandt is arguing that Technovative's *equity interests* in non-debtor subsidiaries may not be sold because those subsidiaries are in possession of the intellectual property, the Court finds that this argument lacks merit," RA1871 (*id.* at 21, emphasis in original).

### G.    The Sale Closes

On January 6, 2025, the Trustee filed a notice with the Bankruptcy Court (the "Notice of Closing") stating that "Debtors closed on the Sale of substantially all of their Assets to SeeCubic, Inc. . . . on January 3, 2025 and . . . the Trustee has received as of the date of the Closing a total of Seven Million Five Hundred Thousand Dollars ($7,500,000.00) . . . ."  TA674-75 (Bankr. D.I. 915).

## SUMMARY OF THE ARGUMENT

The instant appeals challenge several orders issued by the Bankruptcy Court, which collectively approved the Sale of substantially all assets of the Debtors under section 363 of the Bankruptcy Code following the Bankruptcy Court's approval of a settlement agreement contemplating the Sale. The Trustee advocated for the Sale following thorough investigations and negotiations aimed at maximizing the value of the Debtors' estates for the benefit of all stakeholders, and the Sale was the only viable option for bringing essential funding into the Debtors' estates.

First, the appeals should be dismissed as moot pursuant to 11 U.S.C. § 363(m), as the Appellants failed to obtain a stay of the Sale, and SeeCubic, a good faith purchaser, consummated the transaction, thus prohibiting any relief on appeal.

Second, VSI lacks standing to pursue its appeal, as it is not a creditor of the Debtors.

Third, the Appellants' arguments are not supported by adequate record citations, leaving the Trustee and this Court to guess as to the purported underlying record support.

Fourth, the approval of the Settlement met all legal requirements and was within the Bankruptcy Court's discretion. The settlement was the product of the Trustee's informed and reasonable business judgment and provided immediate and necessary funding to the Debtors' estates, thereby maximizing a potential recovery for unsecured creditors.

Fifth, the Bankruptcy Court properly approved the bidding procedures. The procedures were fair, transparent, and designed to promote competitive bidding, thereby ensuring the maximization of asset value.

Sixth, the Sale itself was duly approved and explicitly involved only Debtor-owned assets. The applicable APA explicitly excluded any intellectual property owned by third parties such as

Rembrandt and, to the extent that such intellectual property may reside in property held by the Debtors' subsidiaries, the Sale transferred only the Debtors' equity in those subsidiaries, and did not transfer title to property held by the subsidiaries. Rembrandt remains free to attempt to assert its ownership claims against those subsidiaries (and indeed has done so).

Finally, the Bankruptcy Court's decisions were well-supported by the factual record, which demonstrated that the Trustee, with the aid of professionals and following exhaustive efforts, acted in the best interests of the debtors and their creditors. The outcomes of these proceedings are well-founded in law and fact and should be affirmed on appeal.

## ARGUMENT

**A.    The Appeals Should Be Dismissed as Statutorily Moot Under Section 363(m) of the Bankruptcy Code**

### i.    Standard for Statutory Mootness

Section 363 of the Bankruptcy Code allows a trustee, after notice and a hearing, to sell property of the estates outside of the ordinary course of business and "free and clear" of any other interests. 11 U.S.C. §§ 363(b)(1) and (f). Section 363(m) limits an appellant's ability to challenge such a sale on appeal, providing that when the bankruptcy court has authorized a sale to a good-faith purchaser, the sale cannot be undone or modified on appeal unless it was stayed pending appeal:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

Section 363(m) moots an appeal affecting a sale when "(1) the underlying sale or lease was not stayed pending the appeal, and (2) the court, if reversing or modifying the authorization to sell

or lease, would be affecting the validity of such a sale or lease." *In re Pursuit Cap. Mgmt., LLC*, 874 F.3d 124, 135 (3d Cir. 2017) (quotation marks and citation omitted). To reach this two-part test, the court must first ask whether the buyer purchased the property in good faith. *Id.* That requires a purchase for "appropriate value." *Id.* at 137.

Section 363(m)'s primary purpose is to "promote the finality of sales." *Id.* at 133 ("[Section 363(m)] provides not only . . . finality to the judgment of the bankruptcy court, but particularly . . . finality to those orders and judgments upon which third parties rely.") (ellipses in original; quotation marks and citations omitted); *accord In re Energy Future Holding Corp.*, 596 B.R. 473, 477 (D. Del. 2019), *aff'd*, 949 F.3d 806 (3d Cir. 2020).

Section 363(m) also serves "to encourage participation in bankruptcy asset sales and increase the value of the property of the estate by protecting good faith purchasers from modification by an appeals court of the bargain struck with the [trustee]." *In re Brown*, 851 F.3d 619, 622 (6th Cir. 2017) (alterations in original; quotation marks and citation omitted); *see also Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 500 (3d Cir. 1998) ("[S]ection 363(m) was created to promote the policy of the finality of bankruptcy court orders, and to prevent harmful effects on the bidding process resulting from the bidders' knowledge that the highest bid may not end up being the final sale price.").

Section 363(m) "explicitly require[es] a stay of a bankruptcy court order pending appeal." *Pittsburgh Food & Beverage, Inc. v. Ranallo*, 112 F.3d 645, 648 (3d Cir. 1997). Thus, where a stay of an order approving a sale has not been obtained, such an appeal must be dismissed. *See id.* at 647-51. A party can avoid dismissal based on statutory mootness only in the "rare" case when reversal or modification of the sale order will not affect the sale's validity. *See Pursuit*, 874 F.3d at 138.

ii.    **The Elements of Statutory Mootness Are Satisfied Here**

1.    **The Sale Order Was Not Stayed**

Although they immediately filed a joint notice of appeal of the Sale Order, Appellants failed to obtain a stay of the order pending appeal, and, as set forth above, the Sale closed on January 3, 2025.  *See* TA674-75.  On December 9, 2024, instead of timely seeking a stay pending appeal with the Bankruptcy Court, Appellants filed an Emergency Joint Petition for (I) of Mandamus; (II) Writ of Prohibition; (III) Motion for Stay Pending Appeal; and (IV) In the Alternative, Motion for Withdrawal of Reference of Bankruptcy Court (the "Mandamus Petition") with this Court, which was assigned E.D. Pa. No. 24-cv-6548.  *See* TA711-87  On December 12, 2024, after consideration of the Trustee's opposition (TA788-829), this Court summarily denied the Mandamus Petition due to, *inter alia*, Appellants' failure to first apply to the Bankruptcy Court for a stay pending appeal as required by Bankruptcy Rule 8007.  *See* TA830-31.

On December 23, 2024 – two weeks after Appellants filed their notice of appeal of the Sale Order and eleven days after this Court denied the Mandamus Petition – VSI filed a motion in the Bankruptcy Court to stay the Sale Order pending appeal (the "Belated Stay Motion").  *See* TA436-465 (Bankr. D.I. 898).  VSI noticed the Belated Stay Motion in the ordinary course and did not seek emergency or expedited consideration, *see* TA669-73 (Bankr. D.I. 906), and the Sale closed prior to the January 29, 2025, motion hearing date.  *See* TA674-75 (Bankr. D.I. 915).  On January 29, 2025, after holding a hearing, the Bankruptcy Court issued an order denying the stay pending appeal and holding as follows:

> VSI was . . . on notice as of the Sale Hearing that the Trustee and SeeCubic intended to close on the Sale soon after an order approving it was entered. . . . The Stay Motion offers no explanation as to VSI's reasoning in not filing the Stay Motion promptly after the Sale Order was entered and seeking expedited consideration thereof.  Since its filing, however, the Closing on the Sale has occurred, as authorized by the Sale Order.  Moreover, the Sale Order found that the Purchaser

was a good faith purchaser entitled to the protections afforded by §363(m) of the Bankruptcy Code.

Having both delayed in filing the Stay Motion and then setting it for a hearing more than a month and a half after the Sale Order became effective, VSI sat on its right to seek a stay pending resolution of the Appeal before the Closing could occur. That renders the Appeal moot, and the Court denies the Stay Motion as moot as well. *See e.g., Pittsburgh Food & Bev., Inc. v. Ranallo*, 112 F.3d 645, 649-651 (3d Cir. 1997) (because the appellant did not obtain a stay of the bankruptcy court's order approving a sale of assets, the district court was unable to grant effective relief to the appellant without affecting the validity of the sale, and therefore the appeal to the district court was moot and properly dismissed); *In re Hagood Reserve, LLC*, 2010 WL 5067444 (Bankr. W.D.N.C. 2010) (denying motion to stay a sale order pending appeal as moot where the appellant unilaterally set the hearing on the motion well beyond the date the sale order became effective, without seeking an extension of Bankruptcy Rule 6004(h)'s 14-day stay and without seeking expedited consideration of the motion, thereby allowing the sale transaction to close before the stay motion would be heard and rendering the requested relief moot).

TA676-79 (Bankr. D.I. 938, formatting altered). Incredibly, given that the Sale had closed nearly a month and a half prior, on February 11, 2025, Appellants filed a notice of appeal as to the Bankruptcy Court's denial of a stay pending the instant appeals (Bankr. D.I. 941), with the appeal docketed with this Court under E.D. Pa. No. 25-cv-751-JMG.

Accordingly, the instant appeals are moot as a matter of law as it is clear that the party challenging a sale must obtain a stay to avoid dismissal. *See Pursuit*, 874 F.3d at 138 ("Our responsibility is to apply [section 363(m)], not to accommodate [parties] in their failure to comply with it."); *see also Brown*, 851 F.3d at 622 ("[Section 363(m)'s] mootness rule applies regardless of the merits of legal arguments raised against the bankruptcy court's order . . . .") (quotation marks and citation omitted).

### 2. SeeCubic Was a Good Faith Purchaser Within the Meaning of Section 363(m)

Appellants' arguments that SeeCubic was an inappropriate purchaser because of its bad acts fail because, under Third Circuit law, the good faith of a purchaser is measured by the

purchaser's conduct during the course of the sale proceedings.  The Bankruptcy Code does not define "good faith," but based on "traditional equitable principles" courts hold that "the phrase encompasses one who purchases in good faith and for value." *Pursuit*, 874 F.3d at 135.  The Third Circuit has held that the good faith requirement "speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (quotation marks omitted).

The Sale Order provides:

> The Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections thereof. The Sale contemplated by the Asset Purchase Agreement is undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code. The Buyer is a good faith purchaser of the Assets and is entitled to all the protections afforded by section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including, without limitation, the assumption and assignment of the Assigned Contracts) to the Buyer.

RA49 (Sale Order at ¶ 20); *see also* RA32-33 (*id.* at ¶ T).  The Bankruptcy Court further explained in its Sale Opinion:

> The Court had no evidence that SeeCubic did not act in good faith in connection with the Sale.  Rather, SeeCubic exercised the credit bid right it was granted under the Settlement, and no further participation or action was required because no Auction was had.  While VSI and Rembrandt argue mightily that SeeCubic and its principal, Shadron Statsney, are conflicted actors who have previously attempted to obtain and/or control the Assets by improper means, the test for good faith relates to the sale process.

RA1870 (Sale Opinion at 20).

Appellants have not presented any evidence of fraud by SeeCubic during the sale process, collusion between SeeCubic and other bidders or with the Trustee, or attempts to take grossly

unfair advantage of other bidders. *See Abbotts Dairies*, 788 F.2d at 147.[3]  The evidence before the

Bankruptcy Court established that the Trustee had robust, arms'-length settlement negotiations

with SeeCubic and that SSG conducted an open and fair marketing process.  While there were no

other bids, Appellants have presented no evidence that the lack of other bids was a result of

anything other than a lack of interest in purchasing the assets.

    With respect to the "value" element of good faith, the Bankruptcy Court determined the

consideration provided by the Buyer "constitutes reasonably equivalent value and fair and

adequate consideration for the Assets."  RA32 (Sale Order at ¶ T); *see also* RA34 (*id.* at ¶ X).  The

Third Circuit has held that a public auction is generally the best evidence of the value of the

bankrupt debtor's assets.  *See Pursuit*, 874 F.3d at 136 (citing *Abbotts Dairies*, 788 F.2d at 149).

Absent collusion, "a competitive auction strongly indicates that a purchaser has paid appropriate

value for estate assets."  *Id.* at 137; *see also In re 388 Route 22 Readington Holdings, LLC*, 2021

WL 4811409, at *2 (3d Cir. Oct. 15, 2021).   Here, even though the auction was ultimately

unnecessary because no additional bids were received, the fact that the Trustee and SSG "engaged

in a robust and extensive marketing and sale process in accordance with the Bidding Procedures

Order" (RA30, Sale Order at ¶ I) in order to solicit bids for the anticipated auction provides

evidence that the Trustee obtained the best value possible for the assets sold.  *See In re Tempo*

*Tech. Corp.*, 202 B.R. 363, 370 (D. Del. 1996) (affirming bankruptcy court's finding of good faith

---

[3]      VSI's allegations about Stastney and SeeCubic's pre-petition conduct have no bearing on
the analysis because "the test for good faith relates to the sale process."  RA1870 (Sale Opinion at
20).  Apparently recognizing this, VSI tries to impugn the Sale process by accusing the Trustee of
"perjur[ing] himself on the stand" during the Sale hearing, but the testimony VSI points to (which,
in any event, is truthful) bears no relevance at all to the Sale or the approval factors under § 363.
*See* E.D. Pa. 24-cv-6397, D.I. 16 at 13, 38.  Whether or not the Trustee at some point told people
at VSI they were "the subject of a civil conspiracy" has nothing to do with the Sale, the Assets,
the terms of the APA, the marketing process, or any of the well-settled factors that bankruptcy
courts look to in determining whether to approval a sale of assets.

where, while there was only one bidder, the auction procedures were reasonable and there was no evidence any other party's interest in bidding was chilled).

### 3.    Modification of the Sale Order Will Impact the Sale's Validity

When appellants have failed to obtain a stay, statutory mootness under section 363(m) can be avoided only in the "rare" case when reversal or modification of the sale order will not affect the sale's validity.  *See Pursuit*, 874 F.3d at 138.  This is a "high bar" to meet, and a "narrow exception" that may be satisfied only if the challenges to the sale order are "so divorced from the overall transaction that the challenged provision would have affected none of the considerations on which the purchaser relied."  *Id.* at 139.  The Third Circuit has indicated that the following challenges affect a sale's validity: (1) any challenge to a "central element" of the sale; and (2) any challenge that "would claw back the sale from a good-faith purchaser."  *Id.*  To determine whether a challenge affects the validity of a sale, courts "must look to the remedies requested by the appellants."  *Id.*

Here, Appellants seek to overturn the sale to SeeCubic and presumably have the Debtors' assets sold at auction to another unknown buyer.  It cannot reasonably be disputed that, if successful, the appeals would reverse or modify the Sale Order.  Appellants' proposed relief strikes at the core of the transaction itself and its validity, and plainly impacts provisions "on which the purchaser relied."  *See Energy Future*, 596 B.R. at 477.  The proposed relief relates to "central elements" of the Sale and obviously seeks to claw back the Assets from the Buyer.  *See Pursuit*, 874 F.3d at 139.  This is exactly the kind of appeal that section 363(m) and the Third Circuit prohibit in the absence of a stay.

Appellants' arguments that the assets sold were not property of the estate—which are baseless, as discussed at length herein—do not allow them to escape statutory mootness.  In

*Pittsburgh Food*, the appellant argued that its appeal to the district court was "not moot" because "[the] assets [at issue] were not property of the bankruptcy estate so that the Bankruptcy Code provisions governing sales of property of an estate and appeals from orders approving such sales are inapplicable in this case." *Pittsburgh Food*, 112 F.3d at 647. The Third Circuit rejected this argument and affirmed the dismissal of the appeal as moot. *See id.* at 649-50. As the Third Circuit explained, the relevant inquiry is whether, without a stay, reversal or modification of the sale order would affect the validity of the sale—and all of the arguments raised and remedies sought by the appellant would do so. *See id.* at 650 (discussing that appellant's arguments about whether the trustee had authority to sell the assets and whether the sale price was inadequate were obviously intended to affect the validity of the sale). Nor did appellant's argument that the bankruptcy court "did not have jurisdiction over [the] assets" undermine the Third Circuit's conclusion "because section 363(m) does not distinguish between a challenge to an order approving a sale predicated on jurisdictional grounds and a challenge based on other grounds." *Id.*

The same reasoning applies here. Appellants, through their Appeals of the Settlement (which provided for the Sale process), the Bidding Procedures, and the Sale, seek to undo the Sale entirely. Like the appellant in *Pittsburgh Food*, they challenge, among other things, whether the assets were property of the estate and the adequacy of the sale procedures—inquiries which, if successful, would clearly affect the validity of the Sale. Accordingly, because Appellants failed to obtain a stay pending appeal, its appeal is statutorily moot and should be dismissed.

## B.    VSI Lacks Standing to Pursue Its Appeals

VSI's only interest in the Debtors' bankruptcy cases is as a purported investor or equity holder in Stream. *See* TA59-60 (Bankr. D.I. 58, Stream's List of Equity Security Holders). VSI holds no monetary claims against either of the Debtor estates. *See* TA4-5, 9-55 (VSI not listed in

Stream's Schedules of Secured and Unsecured Creditors); TA702, 706-08 (VSI not listed in Technovatives's schedules of secured and unsecured creditors); TA680-84 (VSI not listed in Stream's claim register); TA709-10 (VSI not listed in Technovative's claims register).

Only "'persons aggrieved' by an order of the Bankruptcy Court" have standing to appeal from such an order. *In re Prospector Offshore Drilling S.a R.L.*, 2019 WL 1150563, at *6 (D. Del. Mar. 12, 2019), *aff'd sub nom. In re Paragon Offshore plc*, 2022 WL 1055574 (3d Cir. Apr. 8, 2022) (holding an out-of-the-money equity holder lacked standing to appeal a bankruptcy court order approving a settlement modifying the Chapter 11 confirmation order). "[S]tanding is a jurisdictional requirement. Thus, it is never waived, and can be asserted at any stage in the litigation." *In re ANC Rental Corp.*, 280 B.R. 808, 815 (D. Del. 2002) (bankruptcy appeal).

The "persons aggrieved" test "exists as a prudential standing requirement that limits bankruptcy appeals to persons whose rights or interests are directly and adversely affected pecuniarily by an order or decree of the bankruptcy court." *Id.* (quoting *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 214 (3d Cir. 2004)). The "persons aggrieved" test is "more restrictive" than Article III standing because of the "particularly acute need to limit appeals in bankruptcy proceedings, which often involve a myriad of parties . . . indirectly affected by every bankruptcy court order." *In re Revstone Industries LLC*, 690 F.App'x 88, 89 (3d Cir. 2017); *see also Travelers Ins. Co. v. U.K. Porter Co.*, 45 F.3d 737, 741-43 (3d Cir. 1995) (holding insurers lacked appellate standing because even if they were exposed to some potential harm "incident" to the Bankruptcy Court's order, they were not "directly affected" by it).

The Bankruptcy Court's orders approving the Settlement, Bidding Procedures, or Sale had no impact whatsoever on VSI. VSI is not a creditor of the Debtors' estates and cannot demonstrate that the challenged orders diminished its property, increased its burdens, or impaired its rights.

*See In re Wilson*, 563 B.R. 519, 522 (E.D. Pa. 2016) ("The party seeking appellate standing must show the order of the bankruptcy court 'diminishes their property, increases their burdens, or impairs their rights.'") (quoting *In re PWS Holding Corp.*, 228 F.3d 224, 249 (3d Cir. 2000)).  It is unclear what harm VSI even maintains it has suffered, but parties who "suffer[] only potential harm or collateral damage" from a bankruptcy court order do not have appellate standing.  *Id.*; *see also In re Wilson*, 563 B.R. at 523 (party that "has not demonstrated anything more than a potential or speculative injury contingent upon events that have not happened and may never happen" did not have appellate standing).

Even to the extent VSI, as an equity holder, had sufficient standing as a "party in interest" under 11 U.S.C. § 1109(b) to be heard in the Bankruptcy Court, **that standing does not extend to appellate standing**.  *See Prospector Offshore Drilling*, 2019 WL 1150563, at *6 ("While [11 U.S.C. § 1109(b)] 'confers broad standing at the trial level,' 'courts do not extend that provision to appellate standing.'") (quoting *PWS Holding*, 228 F.3d at 249).

VSI suffered no pecuniary injury because, with the secured claims and unsecured claims, there is no value for the VSI claimed equity interests.  *See, e.g.*, RA163-64, R172-73 (Trustee's testimony at Settlement Hearing that debtors are insolvent and non-operational); RA1866 (Sale Opinion at 16, discussing debtors' lack of operations, business activities, or saleable goods when Trustee was appointed); *see also* 11 U.S.C. § 726(a)(6) (treating equity interests as subordinate to creditor claims).  VSI has no interest in the assets transferred as part of the Sale and, because its equity interests were valueless as of the Petition Date (and continue to be), the Sale has not pecuniarily impacted VSI.  *See In re Team Sys. Int'l, LLC*, 2024 WL 5008854, at *4-5 (D. Del. Dec. 6, 2024) (equity holders in insolvent, nonoperational debtor did not have standing to appeal bankruptcy court's approval of settlement).

Because VSI cannot show it is directly and adversely affected pecuniarily by any of the orders being appealed, its appeals should be dismissed for lack of standing.

### C.    Appellants' Arguments Are Not Supported By Record Citations

Under the Federal Rules of Bankruptcy Procedure, an appellant must support its arguments with citations to the record.  *See* FED. R. BANKR. P. 8014(a)(6) (appellant's statement of the case must include "appropriate references to the record"); FED. R. BANKR. P. 8014(a)(8) (appellant's argument must include "citations to the authorities and parts of the record on which the appellant relies").  This Court may properly decline to consider arguments that are not supported by appropriate citations to legal authority or the record.  *See DeForte v. Borough of Worthington*, 844 F. App'x 511, 514 (3d Cir. 2021) (declining to consider appellant's arguments because their failure to properly cite to the record "ma[de] it impossible to conduct any meaningful review").

Here, Appellants' briefs contain minimal citation to the record.  For example, Appellants make sweeping contentions concerning various bankruptcy proceedings (some related to the challenged orders, some not) and alleged misconduct by the Hawk parties, SeeCubic, and the Trustee without any meaningful citation to the record.  Many of Rembrandt's arguments are based on a May 23, 2021, Settlement Agreement that it trumpets throughout its brief—yet nowhere in its brief does Rembrandt identify the pages of its Appendix where this document can be found.[4]

Neither the Court nor the Trustee should be expected to comb the extensive record in this case to make sense of Appellants' arguments or locate documents they rely on.  The Court should

---

[4]    Page 6 of Rembrandt's brief [E.D. Pa. 24-cv-2727, D.I. 18] assets that the May 23, 2021 Settlement Agreement – which it defines as the "Stream Settlement Agreement" – can be found at RA1263-1270, yet these pages appear to contain an unsigned Term Sheet dated April 9, 2019. The Trustee assumes that Rembrandt intended to cite RA1468-RA1517, but this is just one of many examples in Appellants' briefs where the Trustee is forced to guess as to the supposed record support for Appellants' arguments.

decline to consider any factual assertions or legal arguments that are unsupported by appropriate

citations to the record. *See DeForte*, 844 F. App'x at 514.[5]

### D. The Trustee Was Authorized Under the Bankruptcy Code to Sell the Stream Debtor's Assets and the Equity in Technovative's Downstream Entities

VSI and Rembrandt both devote considerable portions of their appeal briefs incorrectly

contending that the sale process provided for in the Settlement and the Sale that ultimately occurred

involved the sale of property, specifically intellectual property, in which the Debtors did not have

an interest. VSI and Rembrandt argue that (i) the Trustee was not allowed to sell non-estate

property and (ii) before approving a sale, the Bankruptcy Court was required to first determine

whether such property constituted property of the estate. The arguments of VSI and Rembrandt

fail. The Trustee only sold assets owned directly by the Debtors. To be clear, the assets that were

transferred by the Trustee in connection with the Sale were limited to the Stream assets identified

in the APA (attached to the Sale Order) and the ownership interests of Technovative in non-debtor

subsidiaries. *See* RA74-77 (Sale Order at Ex. 1, APA §§ 2.1, 2.2); *see also* RA35-36 (Sale Order

at ¶ AA). The Trustee did NOT transfer title to any property owned by those non-debtor

subsidiaries.

#### i. The Sale Only Involved Estate Property

It is axiomatic that the Bankruptcy Code, particularly section 363, which provides for the

sale of estate assets, does not expand the property rights of the estate beyond the parameters of

non-bankruptcy law that creates the property right in the first place. 11 U.S.C. § 541(a)(1) provides

---

[5]     Rembrandt also fails to cite legal authority for many of its contentions of error—arguing, for example, that the Bankruptcy Court committed reversible error by approving the settlement and the sale, without citing any of the relevant standards by which courts approve such transactions. *See, e.g.*, Rembrandt Br. [E.D. Pa. 24-cv-2727, D.I. 18] at pp. 18-23. The Court should decline to consider contentions of error that are unsupported by legal authority. *See DeForte*, 844 F. App'x at 514.

that the filing of a voluntary bankruptcy petition creates an estate comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." Without question, section 541(a)(1) is applied broadly and includes "all kinds of property, including tangible or intangible property, causes of action . . . and all other forms of property. . . ." *Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233, 241 (3d Cir. 2001) (quoting *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.9 (1983)).

11 U.S.C. § 363(b) of the Bankruptcy Code allows a trustee to sell property of the estate outside the debtor's ordinary course of business after notice and a hearing. Implicit within the statutory grant of authority to sell property under section 363 is the requirement that the estate has an interest in the property to be sold. *See In re Atl. Gulf Cmtys. Corp.*, 326 B.R. 294, 298-99 (Bankr. D. Del. 2005) (citing, *inter alia*, *Cinicola v. Scharffenberger*, 248 F.3d 110, 121 (3d Cir. 2001)). However, because "property of the estate" under section 541(a) includes contingent and disputed property interests of a debtor, an estate can normally convey its ownership interest in property even if a third party asserts a claim against that property. *See In re Kane*, 628 F.3d 631, 641 n.7 (3d Cir. 2010); *Atl. Gulf Cmtys.*, 326 B.R. at 300 (holding that trustee could convey whatever interest the estate may have in disputed property by quitclaim deed, and third parties would be free to assert their ownership claim against the buyer in the appropriate forum).

The Sale involved only Stream-owned assets and Technovative-owned equity interests, as set forth in the APA's "Transferred Assets" provisions. *See* RA74-75 (Sale Order at Ex. 1, APA § 2.1(a)-(b), concerning "rights, properties and assets of Stream"); RA76 (*id.* at § 2.1(c), concerning "shares of capital stock, equity interests, or other ownership interests . . . directly owned or otherwise held by Technovative"). The APA also identifies numerous "Excluded Assets" that were not transferred to the Buyer as part of the Sale, including "any grant of rights or license by

Rembrandt . . . or affiliates to Stream" and "any physical assets that contain or include Rembrandt

Intellectual Property[.]"  RA77 (*id.* at § 2.2(j)-(k)).[6]

In light of these provisions, Appellants cannot reasonably maintain that the Rembrandt

License, Rembrandt IP, or physical assets containing Rembrandt IP were included among the Sale

assets.  The APA only provides for the transfer of assets belonging to the Debtors and thus does

not run afoul of sections 363 or 541.  Moreover, the APA expressly preserves Rembrandt's right

to pursue any IP-related claims it purports to have against the Buyer.  *See, e.g.*, RA77 (*id.* at § 2.3,

(providing that "the Buyer . . . assumes any liability to the extent that there is any claim or cause

of action alleging that any Intellectual Property of any third party, including but not limited to the

Rembrandt Intellectual Property, has been improperly transferred or sold to the Buyer . . . as part

of the Transferred Assets at Closing"); RA1868 (Sale Opinion at 18, "to the extent Rembrandt

believes SeeCubic's use of the Assets after closing violates its rights, litigation against the

purchaser is not barred").

## ii.  Even If Rembrandt IP Was Implicated In the Sale, the Assets Were Properly Sold Free and Clear Pursuant to Section 363(f)

Under section 363(f) of the Bankruptcy Code, a trustee can sell property of the estate free

and clear of any interest in such property of an entity other than the estate, provided that one of

five conditions is met, including that "such interest is in bona fide dispute."  11 U.S.C. § 363(f)(4).

Furthermore, section 363(f) permits the bankruptcy court to authorize a sale free of "any interest"

that an entity has in property of the estate.  *In re TWA, Inc.*, 322 F.3d 283, 290 (3d Cir. 2003).

In determining whether a "bona fide dispute" exists, courts inquire whether "there is an

objective basis—either in law or fact—to cast doubt on the validity" of the asserted interest.  *In re*

---

[6]     Additionally, all liabilities "under or relating to" the grant of rights or license referenced in § 2.2(j) are defined as "Excluded Liabilities" in the APA.  *See* RA78 (Sale Order at Ex. 1, APA § 2.4(d)).

*Revel AC, Inc.*, 802 F.3d 558, 573 (3d Cir. 2015).  "The Court's objective is to ascertain whether a dispute that is bona fide exists; the court is not to actually resolve the dispute."  *In re Williamsburg Boutique LLC*, 663 B.R. 217, 225-26 (Bankr. S.D.N.Y. 2024) (cleaned up).

Here, the Bankruptcy Court properly found that the assets at issue may be sold free and clear of any interests of third parties, pursuant to section 363(f).  The Bankruptcy Court explained:

> Rembrandt asserts it (and Philips) has intellectual property that may not be transferred to SeeCubic. To the extent those rights exist, they are excluded under the APA. To the extent Rembrandt is arguing that Technovative's *equity interests* in non-debtor subsidiaries may not be sold because those subsidiaries are in possession of the intellectual property, the Court finds that this argument lacks merit. **Even if it did not, however, it fails to prevent the Sale because whether the assets containing Rembrandt's (and Philips') intellectual property are property of *the Debtors' bankruptcy estate*, and therefore subject to the Sale, is the subject of bona fide dispute** because property of the estate only includes all legal or equitable interests of the debtor in property.

RA1871 (Sale Opinion at 21) (italics in original, bold emphasis added).

Rembrandt admits that a bona fide dispute existed.  *See* Rembrandt Br. [E.D. Pa. 24-cv-2727, D.I. 18] at p. 31 (". . . whether Rembrandt's ownership of trade secrets within the estate was in bona fide dispute, **it was**") (emphasis added).  This admission alone should negate any argument that § 363(f)(4) does not apply.  *See In re Nordlicht*, 115 F.4th 90, 112 (2d Cir. 2024) (holding party was bound by counsel's concession that lien was in dispute).

Even absent this concession, however, Appellants cannot dodge the applicability of section 363(f)(4).  There is an objective basis, in law and fact, to cast doubt on the validity of Rembrandt's asserted interest in the Sale assets.  *See In re Scimeca Found., Inc.*, 497 B.R. 753, 773, 785 (Bankr. E.D. Pa. 2013).  The terms of the APA make crystal clear that Rembrandt IP was excluded from the Sale.  As part of the Sale, the Trustee sold Stream-owned assets and Technovative-owned *equity interests* in non-debtor subsidiaries; none of the property owned by those non-debtor subsidiaries was sold.  Given the terms of the APA, the assertion that Rembrandt IP is in the

possession of non-debtor subsidiaries is not a sufficient basis to prevent the Sale of Technovative's equity interests in the subsidiaries (or assets owned directly by Stream) free and clear under section 363(f). *See Williamsburg Boutique*, 663 B.R. at 226 (bona fide dispute existed where plain language of contract cast doubt on claim).

VSI offers no legal support for its argument that the "'*bona fide* dispute' standard" should not apply because it is "insufficient" under these facts. VSI Br. [E.D. Pa. 24-cv-6397, D.I. 16] at p. 30. The Bankruptcy Court was not free to simply disregard the statutory language of section 363(f) or governing case law. "The goal of § 363(f)(4) is to allow the sale of property subject to dispute so that liquidation of the estate's assets need not be delayed while such disputes are being litigated." *In re Southland Royalty Co. LLC*, 623 B.R. 64, 99 (Bankr. D. Del. 2020). That is what occurred here—the Bankruptcy Court's approval permitted the Sale to go forward, while Rembrandt's purported claims can continue to be litigated. *See, e.g.*, RA44 (Sale Order at ¶ 12, "For the avoidance of doubt, Rembrandt 3D Holding Ltd. is not an Enjoined Party with respect to claims it purports to have against the Buyer related to Rembrandt Intellectual Property alleged to be part of the Transferred Assets."); *see also* RA77 (Sale Order at Ex. 1, APA § 2.3).

### iii. The Bankruptcy Court Was Not Required to Make Additional Determinations About Property of the Estate or Rembrandt's Interests Prior to Approving the Settlement or the Sale

Appellants argue that the Bankruptcy Court was required to make factual findings about whether or not Rembrandt's intellectual property is property of the estate and that it needed to make those findings as part of a separate adversary proceeding (not just as part of the sale approval process). These arguments should be rejected. Notably, Rembrandt *never commenced* the adversary proceeding it claims was necessary. Approval of the Sale did not require findings about Rembrandt's interests and none of the cases the Appellants cite establishes otherwise.

Appellants rely heavily in their appeal briefs on *In re Whitehall Jewelers Holdings, Inc.*, 2008 WL 2951974 (Bankr. D. Del. July 28, 2008), for the proposition that, before approving a sale, the bankruptcy court must determine, via an adversary proceeding, whether the property the debtor proposes to sell constitutes property of the estate. Their reliance on *Whitehall* is misplaced. In *Whitehall*, the debtors were attempting to sell consigned goods, which they had received from consignment vendors on a "sale or return" basis. The bankruptcy court held that the debtors could not sell the consigned goods without first demonstrating they were property of the estate, because the only evidence before the court indicated the opposition conclusion (i.e., that they were property of the consignment vendors). *See id.* at *4, *6. In contrast, the Trustee here is not seeking to sell any assets that are not property of the estate. As has been made abundantly clear in this filing and in the filings before the Bankruptcy Court, the APA specifically excluded from the Sale the Rembrandt License or any physical assets that contain Rembrandt intellectual property.

Rembrandt also purports to rely on *In re Atl. Gulf Cmtys. Corp.*, 326 B.R. 294 (Bankr. D. Del. 2005), a case which Rembrandt contends concerns "escrow funds." Rembrandt Br. [E.D. Pa. 24-cv-2727, D.I. 18] at 25-26. The *Atlantic Gulf* decision that Rembrandt cites, however, has nothing to do with "escrow funds" or contingent rights to such funds and, in any event, does not support Rembrandt's position.[7] In *Atlantic Gulf*, the trustee sought to sell the debtor's rights in certain riverfront lots in Florida via quitclaim deed, but the debtor's ownership interest in (and thus right to sell) a portion of the land was disputed. The bankruptcy court found that the land could be

---

[7]    It appears that Rembrandt may have intended to cite to a later *Atlantic Gulf* decision—*In re Atl. Gulf Communities Corp.*, 369 B.R. 156 (Bankr. D. Del. 2007) ("*Atlantic Gulf II*")—but that decision does not support Rembrandt's arguments either. Here, unlike in *Atlantic Gulf II*, there is no escrowed property at issue and, contrary to Rembrandt's assertions, the Trustee did not sell any "conditional licensing" rights related to Rembrandt intellectual property. Indeed, the APA specifically excludes any Rembrandt-related licensing rights. *See* RA77 (Sale Order at Ex. 1, APA § 2.2(j)).

sold via quitclaim deed notwithstanding the disputes, and that the disputes could be adjudicated in the appropriate forum with the buyer post-sale.  *See id.* at 300-01 ("Once the estate's interest in the Disputed Property, if any, is sold by the Trustee, the Plaintiffs are free to adjudicate the merits of their claim in a local forum.").  *Atlantic Gulf* thus demonstrates that ownership disputes raised by third parties do not prevent the Trustee from conveying the debtor's interest in property.

Rembrandt's reliance on *In re DeCurtis Holdings LLC*, 2023 WL 5153645 (Bankr. D. Del. Aug. 9, 2023) is also misplaced.  Numerous facts distinguish *DeCurtis* from this case, including that in *DeCurtis*: (i) the assets being sold included a software suite (referred to as the "DXP"); (ii) pre-petition, a jury had found that the DXP software infringed Carnival's patents; (iii) throughout the bankruptcy proceedings, the debtors were specifically trying to sell the DXP assets; (iv) Carnival commenced an adversary proceeding prior to the sale seeking a determination of ownership issues relating to the DXP assets; and (v) certain sale conditions relating to the DXP assets could not be satisfied, including a condition requiring an order from the bankruptcy court declaring that the DXP assets did not infringe.  *See id.* at *2-4, *12, *27.  In stark contrast to *DeCurtis*, in this case the assets sold expressly excluded the Rembrandt License and anything containing Rembrandt IP, no court has ever determined that Rembrandt has an "interest" in assets of the non-Debtor subsidiaries or that any infringement has occurred, Rembrandt did not commence an adversary proceeding to attempt to establish its rights prior to the Sale (despite contending one was necessary), and there were no Sale conditions that could not be satisfied.

Rembrandt further argues for the first time on appeal that the Bankruptcy Court erred by not addressing its licensee rights under section 365(n).  This argument can be rejected for the simple reason that Rembrandt did not raise it below—none of its myriad objections filed in response to the Settlement, Bidding Procedures, or Sale, or its counsel's arguments at the hearings

on those objections, argued that section 365(n) was a basis to deny approval of the Sale. *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 262 (3d Cir. 2009).

Even to the extent Rembrandt's objections argued more generally that the Sale violated the Rembrandt License, the APA did not interfere with any of Rembrandt's licensing rights (which were expressly excluded from the assets sold) and litigation claims (if any) that Rembrandt may have related to those rights, as discussed above and recognized by the Bankruptcy Court. Further, as the Sale Order provides: "The Sellers are not assuming and the Buyer is not taking an assignment of any executory contracts or unexpired leases pursuant to the Asset Purchase Agreement, therefore there are no Assigned Contracts and the Trustee retains all rights to assume or reject all of the Debtors' remaining executory contracts or unexpired leases under section 365 of the Bankruptcy Code." RA38 (Sale Order at ¶ GG). Given the provisions of the APA and the Sale Order, the Bankruptcy Court had no need to make findings concerning the treatment of Rembrandt licensing rights that were not included in the Sale.

### E.    The Bankruptcy Court Properly Approved the Settlement

Federal Rule of Bankruptcy Procedure 9019(a) provides "[o]n the trustee's motion and after notice and a hearing, the court may approve a compromise or settlement." FED. R. BANKR. P. 9019(a). The decision to approve or disapprove a settlement is within the sound discretion of the bankruptcy judge. *See In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996). The settlement must be "fair and equitable." *In re ICL Holding Co., Inc.*, 802 F.3d 547, 551 (3d Cir. 2015). In making this determination, courts in the Third Circuit weigh four factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Martin*, 91 F.3d at 393. In considering the *Martin* factors, the bankruptcy court

does not substitute its judgment for that of the trustee; instead, it considers "whether the terms of the proposed settlement fall below the lowest range of reasonableness." *In re Covenant Partners, L.P.*, 541 B.R. 804, 806 (Bankr. E.D. Pa. 2015).

### i. The Settlement Satisfied the *Martin* Factors and Was Well Within the Range of Reasonableness

It is well-settled that *Martin* sets forth the standard by which bankruptcy courts in the Third Circuit evaluate settlements. Yet neither of the Appellants reference *Martin* or discuss the four factors identified therein. Because none of the Appellants' arguments conceivably implicate the first three factors—probability of success, likely difficulties in collection, and complexity, expense, inconvenience, and delay relating to the litigation—the Court should consider those factors unchallenged. To the extent Appellants' arguments implicate the fourth factor—the paramount interest of creditors—those arguments are without merit and should be rejected.

The Bankruptcy Court held a hearing on the Trustee's motion to approve the Settlement on June 5, 2024 (the "Settlement Hearing"), as well as a hearing on VSI's motion for reconsideration of the Settlement Order on November 7, 2024. *See* RA108-203, RA204-26 (hearing transcripts). The Trustee offered testimony concerning the risks to the estate—including incurring even more expenses, failing to achieve any recovery for creditors, and possibly having to convert to Chapter 7 bankruptcy—in the absence of the settlement, as well as testimony concerning the benefits to the estate and its creditors as a result of the settlement. *See, e.g.*, *id.* at RA-160-177. After hearing the Trustee's evidence, as well as VSI and Rembrandt's objections, the Bankruptcy Court found that "[t]he Settlement represents a valid exercise of the Trustee's business judgment, having been informed by extensive research, investigation, and negotiation by the Trustee and other parties in interest[]." RA 8 (Settlement Order at ¶ 4); *see also* VSIA806 (Order denying VSI's motion for reconsideration at ¶ 7, "The [Bankruptcy] Court determined that the Settlement was reasonable,

fair, and in the best interests of the Debtors' estate based on the totality of the evidence presented at the Settlement Hearing, including the Trustee's analysis of potential success on the merits in the Section 225 Action and the Adversary Proceeding.").

Rembrandt objects to the Settlement on the basis that it "preordain[ed] the sale of Rembrandt's trade secrets as property of the estate" (E.D. Pa. 24-cv-2727, D.I. 18 at 21)—but as discussed herein those arguments are baseless.  Neither the Settlement nor the Sale involved the transfer of Rembrandt trade secrets and Rembrandt's rights have been adequately protected throughout the sale process.  Among other provisions, the Settlement granted an allowed secured claim to Hawk in the amount of $180 million (subject to dollar-for-dollar increase for any additional funding provided to SCBV prior to the Sale closing) and allowed SeeCubic to credit bid $150 million of Hawk's allowed secured claim in connection with the Sale.  *See* RA1853 (Sale Opinion at 3).  "[I]t is the ordinary case that a secured creditor has the opportunity to credit bid its entire claim in a sale under § 363(b) of the Code," though section 363(k) does "give[] the court discretion to deny the ability to credit bid for 'cause.'"  *In re NJ Affordable Homes Corp.*, 2006 WL 2128624, at *16 (Bankr. D.N.J. June 29, 2006).

Here, VSI contends—once again without any citation to the record—that cause exists because SeeCubic "clearly chilled bidding" and "repeatedly harmed" the Debtors' estates, Hawk's claim is invalid, and the Sale was just "Kabuki theater."  E.D. Pa. 24-cv-6397, D.I. 16 at 18.  VSI's conjecture on these issues is insufficient to establish "cause" under section 363(k).  The Bankruptcy Court correctly found that SeeCubic acted as a good faith purchaser *during the sale process*—which is the relevant inquiry.  *See supra* at pp. 22-25; *see also* RA32 (Sale Order at ¶ R.ii, "There is no cause to limit the Credit Bid Amount pursuant to section 363(k) of the Bankruptcy Code.").  The Bankruptcy Court also found that the Bidding Procedures and the

marketing process conducted by SSG were appropriate.  *See infra* at pp. 43-45; RA1867-69 (Sale

Opinion at 17-19).  And, despite VSI's baseless assertions that it "could provide the Debtors' with

a much better offer" (E.D. Pa. 24-cv-6397, D.I. 16 at 16), it never actually did so.[8]

> ii.    **The Settlement and Sale Did Not Constitute an Improper *Sub Rosa* Plan of Reorganization**

VSI argues that the sale process provided for in the Settlement "constituted an

impermissible *sub rosa* plan of reorganization that stripped the Debtors' creditors of the

protections of the Bankruptcy Code and improperly attempted to extinguish their rights without

their consent."  VSI Br., E.D. Pa. 24-cv-6397, D.I. 16 at 19.  This argument should be rejected.

The sale process did not "short circuit" any requirement of the Bankruptcy Code or dictate the

terms of any future reorganization plan.

Courts have consistently acknowledged that assets of a Chapter 11 bankruptcy estate can

be sold prior to the confirmation or filing of a plan of reorganization, provided the sale complies

with section 363 of the Bankruptcy Code.  *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 184 B.R. 648,

653 (S.D.N.Y. 1995) (citing, *inter alia*, *In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992)); *In*

*re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175 (D. Del. 1991).  A bankruptcy trustee is

authorized by statute to "use, sell, or lease, other than in the ordinary course of business, property

of the estate."  11 U.S.C. § 363(b).

Section 363(b), however, does not authorize transactions or settlements that amount to a

"*sub rosa* plan" of reorganization.  *See In re Energy Future Holdings Corp.*, 648 F. App'x 277,

284-85 (3d Cir. 2016).  "A settlement constitutes a *sub rosa* plan when the settlement has the effect

---

[8]      *See, e.g.*, RA1866-67 (Sale Opinion at 16-17, "Prior to [the settlement], the Trustee proposed to VSI that it provide financing to fund the Litigation, but VSI failed to do so. . . . [T]he Trustee also met with VSI and Mr. Rajan to entertain any proposals to buy the Assets or restructure the Debtors' operations. VSI did not, however, present an actionable proposal backed by any financial commitment.").

of dictating the terms of a prospective chapter 11 plan." *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010); *see also In re Energy Future Holding Corp.*, 527 B.R. 157, 168 (D. Del. 2015), *aff'd* 648 F. App'x at 284-85 (a *sub rosa* plan "amounts to a de facto plan of reorganization, which enables a debtor to restructure its debt while bypassing many of the Bankruptcy Code's fundamental creditor protections"). To be found to dictate the terms of a plan, the settlement must either (i) dispose of all claims against the estate or (ii) restrict creditors' rights to vote. *See Matter of Cajun Elec. Power CO-OP., Inc.*, 119 F.3d 349, 354-55 (5th Cir. 1997) (citing *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir.1983)); *see also Capmark Fin. Grp.*, 438 B.R. at 513.

A settlement agreement—which is a "necessary step toward, or building block of, a plan of reorganization"—does not constitute an improper *sub rosa* plan. *In re Nortel Networks, Inc.*, 522 B.R. 491, 508 (Bankr. D. Del. 2014). Courts have approved even large and important settlements prior to confirmation of a plan, notwithstanding a "*sub rosa* plan" objection, where the settlements did not dispose of all of the debtor's assets, restrict creditors' rights to vote on a future plan of reorganization, or dictate the terms of a plan of reorganization. *See, e.g.*, *In re Tower Automotive Inc.*, 241 F.R.D. 162, 169-70 (S.D.N.Y. 2006) (settlement that freed up cash and was an essential first step towards reorganization was not a *sub rosa* plan); *In re Chrysler LLC*, 405 B.R. 84, 97-98 (Bankr. S.D.N.Y. 2009) (sale did not constitute a *sub rosa* plan of reorganization because, following the sale, the debtors would continue to administer their estates and seek to confirm a plan that would provide for the distribution of the value of remaining assets). Furthermore, pre-confirmation approval of a settlement does not amount to a *sub rosa* plan where no party is deprived of critical protections in a Chapter 11 confirmation process because the settlement could have been proposed in the context of a Chapter 11 plan process—meaning that a

confirmation hearing would have been conducted and the settlement would have been considered in exactly the same manner as it was at the pre-confirmation sale hearing. *See Capmark Fin. Grp.*, 438 B.R. at 514.[9]

VSI cannot establish that the Settlement or Sale constituted a *sub rosa* plan of reorganization. As the Bankruptcy Court properly found, the Trustee exercised sound business judgment in entering into the Settlement and it was in the best interests of the Debtors' estates and creditors. *See* RA8 (Settlement Order at ¶¶ 4, 7); *see also In re Iridium Operating LLC*, 478 F.3d 452, 467 (2d Cir. 2007) (settlement not a *sub rosa* plan where it had a proper business justification, benefitted the estate, and cleared the way for implementation of a reorganization plan). The Settlement minimized substantial risks and additional expenses attendant to ongoing litigation (including the risk that creditors ultimately receive nothing), while also providing a carve-out for Debtors' estates, funding for SeeCubic BV (Technovative's Dutch research and development subsidiary), and a sale process for the Debtors' assets to be exposed to the market. *See generally* RA160-177 (Trustee's testimony at Settlement Hearing concerning benefits of the settlement).

None of the factors that led the Fifth Circuit in *Braniff* to conclude that the transaction was a *sub rosa* plan exist here. *Braniff* found that the proposed transaction encroached upon the plan confirmation process because it (a) "changed the composition of Braniff's assets," with the practical effect of dictating some of the terms of any future reorganization plan, (b) dictated that the secured creditors vote their deficiency claim in favor of any proposed plan approved by a majority of the unsecured creditors' committee, effectively placing restrictions on creditors' plan

---

[9]     Even releases contained in a settlement do not transform it into a *sub rosa* plan, as releases are a necessary and expected term in a settlement agreement. The point of settlement is to finally and fully resolve outstanding disputes between the parties, and without such releases, a settlement would be ineffective. This is especially true where the settlement neither releases direct claims held by any third parties nor any claims held by the debtors against their officers and directors. *See Capmark Fin. Grp.*, 438 B.R. at 514.

voting rights, and (c) granted the debtor, its officers, its directors, and the secured creditors a release of all claims by all parties, thereby altering creditors' rights.  *Braniff*, 700 F.2d at 939-40. The Settlement, on the other hand, did not dictate the terms of any future reorganization plan and did not restrict the voting rights or alter any other rights of non-party creditors.

An objector arguing that a proposed sale constitutes a *sub rosa* plan must clearly articulate the rights and benefits creditors are deprived of through the sale but would gain through a Chapter 11 plan.  *In re Summit Glob. Logistics, Inc.*, 2008 WL 819934, at *14 (Bankr. D.N.J. Mar. 26, 2008).  VSI presented no evidence demonstrating that it or any other creditor's recovery was adversely impacted by the settlement or ultimate sale, or that any requirement of Chapter 11 was subverted.  Rather, as the Trustee testified, without the settlement, the Debtors' bankruptcy cases "would prolong – ultimately convert [to Chapter 7], and . . . there might not be value for anybody." RA172; *see also In re QSR Steel Corp., LLC*, 2024 WL 5165206, at *9 (Bankr. D. Conn. Dec. 17, 2024) (settlement not a *sub rosa* plan where "the settlement will facilitate a reorganization plan and the failure to settle will instead likely lead to conversion").  Because the sale process neither subverted the bankruptcy process nor impermissibly dictated the outcome to other creditors, the sale process was not a *sub rosa* plan.

### F.    The Bankruptcy Court Properly Approved the Bidding Procedures Because They Were Fair, Reasonable, and Appropriate Under the Circumstances to Maximize the Value of the Assets

The paramount goal in any proposed bankruptcy sale is to maximize the proceeds received by the estate.  *See In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").  The purpose of procedural bidding orders, in turn, is to "facilitate an open and fair public sale designed to maximize value for the estate."  *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998).  To

accomplish that goal, bankruptcy courts are given broad discretion in approving bidding procedures. *Id.* Once the sale is complete, the bidding process should not be reopened "unless clear evidence of impropriety in the sale process has been demonstrated." *In re Reading Broad., Inc.*, 386 B.R. 562, 575 (Bankr. E.D. Pa. 2008).

VSI appeals the Bidding Procedures Order on the basis that the Bankruptcy Court did not hold a proper evidentiary hearing and that SeeCubic should not have been permitted to bid. Neither of these arguments has any merit. The Bid Procedures set forth in the Trustee's Sale Motion were those contemplated by the Settlement which the Bankruptcy Court had already approved. *See* RA1857 (Sale Opinion at 7). The Bankruptcy Court held a hearing on the Bid Procedures on November 13, 2024. *See* RA227-RA310 (Transcript). The Bankruptcy Court did not simply rubber stamp the Trustee's proposed bid procedures; rather, it heard the objections from VSI and Rembrandt (many of which it had already ruled on in connection with the Settlement) and, in response to those objections and the Bankruptcy Court's concerns about making sure all potential bidders were well-informed, required the parties to supplement the disclosures concerning the assets being sold. *See, e.g.*, RA273 (Bankruptcy Court: "I don't want to set up any procedures until we're clear on exactly what assets are being sold, so that other potential bidders can have some idea."); RA286-RA287; RA294-RA296. It was only after the disclosures were supplemented and the Trustee filed revised schedules to the APA containing disclaimers desired by Rembrandt that the Bankruptcy Court approved the Bid Procedures. *See* RA1859-RA1860 (Sale Opinion at 9-10).

VSI complains that the bid procedures should have been subject to "heightened scrutiny" and suggests that if they had, SeeCubic would not have been allowed to serve as the stalking horse bidder. E.D. Pa. 24-cv-6397, D.I. 16 at 24. There is no evidence, however, that SeeCubic was not

a "good faith purchaser" for purposes of a section 363 sale. *See supra* at pp. 22-25.  Moreover,

even when a court uses "heightened scrutiny" in this context, it does so in order to make sure the

Debtor "market[s] the [property] actively" and "consider[s] alternatives for maximizing value"—

which is exactly what the Bankruptcy Court did here by ensuring that the Sale assets were

sufficiently described for *all* potential purchasers, not just SeeCubic, during the marketing process.

*In re Crown Vill. Farm, LLC*, 415 B.R. 86, 93 (Bankr. D. Del. 2009).[10]  And, unlike in the

*Bidermann* case that VSI relies on, here the Trustee hired an investment banker, SSG, to handle

the marketing process and solicit offers from other parties.  *See In re Bidermann Indus. U.S.A.,*

*Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997).

Because VSI has failed to establish any basis upon which the Bid Procedures should have

been rejected or should be reopened now, this Court should affirm the Bankruptcy Court's order

approving them.

### G.    The Bankruptcy Court Properly Approved the Sale Under Section 363(b)

#### i.    The Sale Satisfies the Requirements of Section 363(b)

The standard for sales of estate property under section 363(b) is one of sound business

judgment.  "Court approval of the trustee's motion to sell is warranted when the trustee has

demonstrated sound business judgment in requesting the sale."  *Scimeca Found.*, 497 B.R. at 771.

In determining whether a sale meets this standard, courts in the Third Circuit require the sale to

satisfy four conditions: "(1) there is a sound business purpose for the sale; (2) the proposed sale

---

[10]    As set forth in the Bidding Procedures Order, the Bankruptcy Court found "The Stalking Horse Bidder is **not** an 'insider' or 'affiliate' of either of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stakeholders exist between the Stalking Horse Bidder and the Debtors."  RA1627 (Bidding Procedures Order at ¶ D) (emphasis added).  Moreover, bankruptcy sales to insiders are not prohibited where the insider relationship is not hidden and there is no evidence of bad faith in the sale process. *See In re HDR Holdings, Inc.*, 2020 WL 6561270, at *5-6 (D. Del. Nov. 9, 2020).

price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has

acted in good faith." *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008). The Bankruptcy

Court has "considerable discretion" in deciding whether to approve a sale of assets under section

363(b). *Culp*, 545 B.R. at 844.

> Here, the Bankruptcy Court's findings supporting approval of the Sale included, *inter alia*:
>
> I. The Trustee and his advisors engaged in a robust and extensive marketing and sale process in accordance with the Bidding Procedures Order and the sound exercise of the Trustee's business judgment. [. . .]
>
> M. The Trustee has demonstrated good, sufficient, and sound business reasons and justifications for entering into the Sale and the performance of its obligations under the Asset Purchase Agreement. The consummation of the Sale contemplated by the Asset Purchase Agreement is in the best interests of the Debtors, their creditors, their estates, and other parties in interest. [. . .]
>
> JJ. Based on the record of the Sale Hearing, and for the reasons stated on the record at the Sale Hearing, the Sale of the Assets must be approved and consummated promptly to preserve the value of the Assets. [. . .] The Trustee has demonstrated (i) compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Asset Purchase Agreement and the Sale under Bankruptcy Code section 363(b) and (ii) that the Sale is fair, reasonable, and in the best interests of the Debtors' estates and creditors. [. . .]
>
> KK. The Trustee has demonstrated that the Asset[] Purchase Agreement and the closing thereon is necessary, appropriate, and presents the best opportunity to realize the value of the Assets and maximize the value of the Debtors' estates. The Sale constitutes a reasonable and sound exercise of the Trustee's business judgment and its powers and duties under applicable law and should be approved.

RA30, 39-40 (Sale Order at ¶¶ I, M, JJ, KK); *see also* RA1865-70 (Sale Opinion at 15-20,

explaining reasons Bankruptcy Court found that Trustee had sound business purpose for the Sale,

including, *inter alia*, that the Debtors were non-operational and insolvent, the assets were properly

marketed, and no other bids were received).

In finding that the Sale satisfied the second factor (fair price) and third factor (adequate

and reasonable notice) of the analysis, the Bankruptcy Court examined the marketing process

conducted by SSG—which included reaching out to nearly 550 parties—and found that it was a "a fair and open sale process" that was "non-collusive [and] duly noticed," and "provided a full, fair, reasonable, and adequate opportunity" for any interested party to make an offer.  RA30 (Sale Order at ¶ K); *see also* RA1867-69 (Sale Opinion at 17-19, discussing sale process).  As the Bankruptcy Court discussed in its Sale Opinion, no party other than SeeCubic expressed an interest or made an offer, leading the Trustee to determine SeeCubic's stalking horse bid "represented the highest, best, and only bid for the Assets."  RA1867 (*id.* at 17).  VSI continues to argue that it could have provided "a much better offer" (E.D. Pa. No. 24-cv-6397, D.I. 16 at 16) for the assets but, as the Bankruptcy Court observed, it *never actually did so* despite Mr. Rajan's knowledge about the assets.  *See* RA1868 (Sale Opinion at 18, describing VSI's criticisms about the marketing process as "puzzling" and "unpersuasive" in light of VSI's own failure to submit a bid).

Finally, with respect to the fourth factor—good faith of the purchaser—the Bankruptcy Court correctly found that the Buyer acted in good faith in connection with the Sale, and that there was no evidence to the contrary.  *See* RA32-34 (Sale Order at ¶¶ T-W); RA1870 (Sale Opinion at 20).  As discussed herein, the Buyer's good faith in connection with the Sale is the only relevant inquiry under Third Circuit law; the Appellants' allegations concerning pre-petition wrongdoing by SeeCubic or Mr. Stastney are not relevant to the inquiry.  *See supra* at p. 24 n. 3.

The Appellants have done nothing to demonstrate the Bankruptcy Court's findings in this regard were an abuse of discretion.

### ii.    No "Criminal Violations" Have Occurred

Rembrandt and VSI both accuse the Trustee and SeeCubic of "criminal violations" under the Economic Espionage Act.  According to the Appellants, the Bankruptcy Court should have denied approval of the Sale because the Trustee and SeeCubic are criminally liable for transferring

Rembrandt trade secrets in violation of 18 U.S.C. § 1832.  Needless to say, no court has ever determined that the Trustee or SeeCubic is criminally liable for any violation of the Economic Espionage Act, and the Bankruptcy Court had no reason or authority to make such a determination.

*First*, neither of the Appellants raised this argument before the Bankruptcy Court.  None of the numerous objections VSI and Rembrandt filed contain criminal accusations or references to the Economic Espionage Act.  The only fleeting reference to this argument the Trustee can find in the record is one sentence from Rembrandt's counsel at the Sale hearing saying, "And so what I am saying is the day of the closing, SCBV, Stream, all of its officers, are violating 1830 [sic] -- U.S.C. 1832, right?"  RA327.  Also, as noted by the Sale Opinion, Rembrandt added a disclaimer to the APA exhibits stating that the buyer will "risk claims under 18 U.S. Code §1832 providing for" fines and/or imprisonment.  *See* RA1860 (Sale Opinion at 10); *see also* RA1621 (presale asset listing including Rembrandt's disclaimer in red font).  These oblique references to a criminal statute absent an explicit request that the Bankruptcy Court apply it are not enough to have preserved the issue for appeal.  *See Brokerage Antitrust Litig.*, 579 F.3d at 262 ("A fleeting reference or vague allusion to an issue will not suffice to preserve it for appeal[.]").

*Second*, even if this Court decides to entertain Appellants' accusations of criminal conduct, nothing in the record, the APA, or the Bankruptcy Court's orders supports them.  Appellants' arguments are based on the faulty premise that assets consisting of or containing Rembrandt trade secrets were transferred as part of the Sale—which, as the Trustee has exhaustively explained, (and the Bankruptcy Court repeatedly recognized) is not true.  "[T]he bankruptcy court is a court of limited jurisdiction and has no jurisdiction to hear criminal matters."  *In re Rothman*, 2024 WL 695753, at *11 (Bankr. D.N.J. Feb. 20, 2024).  "Likewise, a bankruptcy court does not have

jurisdiction to compel an investigation of alleged crimes." *Id.*[11]  In the absence of any jurisdiction to make findings as to criminal liability and the absence of any reason to do so, the Bankruptcy Court did not err.

### iii.      Rembrandt's Interests, If Any, Have Been Adequately Protected

Rembrandt's interests, if any, have been adequately protected throughout the sale process. Importantly, Rembrandt does not have an "interest" in the Non-Debtor Subsidiaries' property; the only thing that Rembrandt has at this juncture is an alleged "claim" that some know how it provided was incorporated in part into source code that is owned by those entities.  The Stream Settlement Agreement that Rembrandt trumpets does not in any way concede that the Debtors in fact used or received any know how or other Rembrandt technology—to the contrary, it specifically provides for no admission of liability.  *See* RA1468.  In this case, the Trustee transferred Technovative's equity ownership interests in Non-Debtor Subsidiaries, in which Rembrandt has NO interest.  Rembrandt attempts to confuse the Court by claiming that the Debtor is transferring Rembrandt's property, but the alleged property amounts to nothing more than a disputed "claim" in the downstream entities' source code, which is not in the Debtors' possession to sell.  Neither the APA nor the Sale Order did anything to extinguish Rembrandt's "claim," and instead expressly preserved it.

Section 361 of the Bankruptcy Code provides for "adequate protection" to be provided to a party whose property is being used, sold, or leased.  Section 361(3), permitting the court to "grant[] such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property," allows flexibility in fashioning the provision

---

[11]      Nor would the Appellants have standing to pursue such criminal actions.  *See Rothman*, 2024 WL 695753, at *11.  To the extent Appellants believe they have civil causes of action under the Economic Espionage Act, they are—as the Bankruptcy Court repeatedly stated at the Sale hearing—free to pursue them before the appropriate court.  *See, e.g.*, RA324, 328.

of adequate protection.  11 U.S.C. § 361(3).

Here, Rembrandt's interest is not in the nature of a security interest, but instead is an unliquidated, disputed unsecured claim.  That interest, whatever it may ultimately be determined to be, was adequately protected in the Sale in a number of ways.  *First*, any claim alleged by Rembrandt that its IP was in some way transferred as a part of the Sale is an assumed liability by the Buyer.  *See* RA77 (Sale Order at Ex. 1, APA § 2.3).  *Second*, any rights Rembrandt has to pursue the nonbankrupt Debtor subsidiary SCBV are preserved; Rembrandt is free to continue its federal court litigation to attempt to have a court determine its interest in the source code of the downstream entity.  *See id.*; *see also* RA44 (Sale Order at ¶ 12, "For the avoidance of doubt, Rembrandt . . . is not an Enjoined Party with respect to claims it purports to have against the Buyer related to Rembrandt Intellectual Property alleged to be part of the Transferred Assets.").  Given the preservation of Rembrandt's rights and specific exclusion of Rembrandt IP from the Sale, Rembrandt's ability to protect its rights has not been altered in any way.

## CONCLUSION

Following multiple contested hearings, the Bankruptcy Court properly approved the Settlement, the Bidding Procedures, and the Sale over the objections of VSI and Rembrandt. Appellants fail to show that the Bankruptcy Court erred with respect to any of the challenged approval orders.  For the reasons set forth herein, the Trustee respectfully requests that this Court affirm the Settlement Order, the Bidding Procedures Order, and the Sale Order.

Respectfully submitted,

Dated:        February 18, 2025              By: */s/ Steven M. Coren*
                                             Steven M. Coren, Esquire
                                             COREN & RESS, P.C.
                                             Two Commerce Square, Suite 3900
                                             2001 Market Street
                                             Philadelphia, PA 19103
                                             Telephone: (215) 735-8700

                                                     and

                                             By: */s/ Michael D. Vagnoni*
                                             Michael D. Vagnoni, Esquire
                                             Edmond M. George, Esquire
                                             OBERMAYER REBMANN MAXWELL & HIPPEL LLP
                                             Centre Square West
                                             1500 Market Street, Suite 3400
                                             Philadelphia, PA 19102
                                             Telephone: (215) 665-3066

                                             *Counsel to the Trustee*

## <u>CERTIFICATE OF COMPLIANCE AND SERVICE</u>

I certify that the foregoing brief complies with: (i) the page limits provided in this Court's December 18, 2024 Scheduling Order because the substantive portions of the brief are 50 pages or less and (ii) the typeface and font requirements provided in the Policies and Procedures of the Honorable John M. Gallagher because it has been prepared in a proportionally spaced typeface (Times New Roman) using Microsoft Word with 12 point font.

On February 18, 2025, I caused an electronic copy of the foregoing brief with the Clerk of Court for the United States District Court for the Eastern District of Pennsylvania by using the CM/ECF system, which will effectuate service on all counsel registered therewith.

<u>/s/ Steven M. Coren</u>
Steven M. Coren, Esquire